**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br>REFCO, INC. et al.<br><br>　　　　　　　　　　Debtors. | Chapter 11<br>Case No. 05-60006 (RDD)<br>(Jointly Administered) |
| JOSEPH MURPHY, WILLIAM M. SEXTON, DENNIS A. KLEJNA, GERALD SHERER, PHILIP SILVERMAN, RICHARD N. OUTRIDGE, TONE GRANT, LEO R. BREITMAN, NATHAN GANTCHER, DAVID V. HARKINS, SCOTT L. JAECKEL, THOMAS H. LEE, RONALD O'KELLEY, and SCOTT A. SCHOEN,<br><br>　　　　　　　　Plaintiffs,<br>　　　v.<br><br>ALLIED WORLD ASSURANCE COMPANY (U.S.), INC. and ARCH INSURANCE COMPANY,<br><br>　　　　　　　　Defendants.<br><br>JOHN D. AGOGLIA, EDWIN L. COX, SUKHMEET DHILLON, THOMAS H. DITTMER, STEPHEN GRADY,THOMAS HACKL, ERIC G. LIPOFF, PETER MCCARTHY and FRANK MUTTERER,<br><br>　　　　　　　Nominal Defendants. | Adv. Proc. No. 08-01133 (RDD) |

**DECLARATION OF JOHN H. EICKEMEYER IN SUPPORT OF**
**ARCH INSURANCE COMPANY'S MOTION TO WITHDRAW**
**THE REFERENCE TO THE BANKRUPTCY COURT**

　　　　I, John H. Eickemeyer, do hereby declare as follows under penalties of perjury pursuant

to 28 U.S.C. § 1746:

　　　　1.　　　　I am counsel for Defendant Arch Insurance Company.

2.      Attached as Exhibit A is a true and correct copy of excerpts of a transcript of hearing held on June 8, 2006, in the bankruptcy case *In re Refco, Inc.,* No. 05-60006 (Bankr. S.D.N.Y.).

3.      Attached as Exhibit B is a true and correct copy of an order entered on February 20, 2007, in the case *Arch Insurance Co. v. Bennett et al.*, No. 600805/06 (N.Y. Sup. Ct.).

4.      Attached as Exhibit C is a true and correct copy of the Opposition of Defendants Dennis Klejna, Joseph Murphy, William Sexton, Gerald Sherer and Philip Silverman to the Motion to Intervene of Arch Insurance Company filed in the adversary proceeding *Axis Reinsurance Co. v. Bennett et al.*, No. 07-01712 (Bankr. S.D.N.Y.).

5.      Attached as Exhibit D is a true and correct copy of excerpts of the transcript of an August 30, 2007, hearing in the adversary proceeding *Axis Reinsurance Co. v. Bennett et al.*, No. 07-01712 (Bankr. S.D.N.Y.).

6.      Attached as Exhibit E is a true and correct copy of Arch's first amended complaint in the action *Arch Insurance Company v. Agoglia, et al.*, No. 08-600029 (N.Y. Sup. Ct.).

7.      Attached as Exhibit F is a true and correct copy of the Stipulated Order for Entry of Judgment against Phillip C. Bennett entered between Arch and Bennett in the action *Arch Insurance Company v. Agoglia, et al.*, No. 08-600029 (N.Y. Sup. Ct.).

8.      Attached as Exhibit G is a true and correct copy of the Stipulation of Discontinuance with Prejudice entered between Arch and Santo C. Maggio in the action *Arch Insurance Company v. Agoglia, et al.*, No. 08-600029 (N.Y. Sup. Ct.).

NEWYORK/#195168.1

9.      Attached as Exhibit H is a true and correct copy of the transcript of hearing on

October 5, 2007, before Judge Koetl in the proceeding *Axis Reinsurance Co. v. Bennett et al.*,

No. M-47 (S.D.N.Y.).

Date:  April 29, 2008


        /s/ John H. Eickemeyer
        John H. Eickemeyer

3

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br>REFCO, INC. et al.<br><br>                            Debtors. | Chapter 11<br>Case No. 05-60006 (RDD)<br>(Jointly Administered) |
| JOSEPH MURPHY, WILLIAM M. SEXTON, DENNIS A. KLEJNA, GERALD SHERER, PHILIP SILVERMAN, RICHARD N. OUTRIDGE, TONE GRANT, LEO R. BREITMAN, NATHAN GANTCHER, DAVID V. HARKINS, SCOTT L. JAECKEL, THOMAS H. LEE, RONALD O'KELLEY, and SCOTT A. SCHOEN,<br><br>                         Plaintiffs,<br>       v.<br><br>ALLIED WORLD ASSURANCE COMPANY (U.S.), INC. and ARCH INSURANCE COMPANY,<br><br>                       Defendants.<br><br>JOHN D. AGOGLIA, EDWIN L. COX, SUKHMEET DHILLON, THOMAS H. DITTMER, STEPHEN GRADY,THOMAS HACKL, ERIC G. LIPOFF, PETER MCCARTHY and FRANK MUTTERER,<br><br>                    Nominal Defendants. | Adv. Proc. No. 08-01133 (RDD)<br><br>**<u>CERTIFICATE OF SERVICE</u>** |

      1.      I, John H. Eickemeyer, hereby declare, pursuant to 28 U.S.C. 1746, under penalty of perjury, as follows:

      2.      On April 29, 2008, I caused a copy of the **DECLARATION OF JOHN H. EICKEMEYER IN SUPPORT OF ARCH INSURANCE COMPANY'S MOTION TO WITHDRAW THE REFERENCE TO THE BANKRUPTCY COURT** to be served upon all parties who have made appearances in the above-captioned action by electronically filing same, thereby ensuring that counsel to each such party, received same, as registered e-filers who are registered to receive e-notices in this case;

NEWYORK/#195168.1

3.     On April 29, 2008, I caused copies of the **DECLARATION OF JOHN H. EICKEMEYER IN SUPPORT OF ARCH INSURANCE COMPANY'S MOTION TO WITHDRAW THE REFERENCE TO THE BANKRUPTCY COURT** to be served upon all parties who have not yet made appearances in the above-captioned case by dispatching true copies of same into the custody of a courier service for overnight delivery, prior to the latest time designated by that service for such delivery, addressed as follows:

> John D. Agoglia
> 3 Sweet Hollow Ct.
> St. James, NY  11780
>
> Edwin L. Cox
> c/o Brian O'Connor, Esq.
> Willkie Farr & Gallagher LLP
> 787 Seventh Avenue
> New York, NY  10019-6099
>
> Sukhmeet Dhillon
> 2 Glastonbury Place
> Laguna Niguel, CA  92677-5310
>
> Thomas H. Dittmer
> 3594 Rockerman Road
> Miami, FL  33133
>
> Stephen Grady
> c/o Lawrence J. Kotler, Esq.
> Duane, Morris & Heckscher LLP
> 30 South 17th Street
> Philadelphia, PA  19103
>
> Thomas Hackl
> c/o Avraham C. Moskowitz, Esq.
> Moskowitz and Book, LLP
> 1372 Broadway
> New York, NY  10018
>
> Eric G. Lipoff
> 16 Clay
> Irvine, CA  92620-3322
>
> Peter McCarthy
> 38 South Bridge Street
> Poughkeepsie, NY  12601

NEWYORK/#195168.1

Frank Mutterer
2043 Bay Blvd.
Seaside Heights, NJ  08751-1001

DATED:  April 29, 2008


    ___/s/  John H. Eickemeyer_____
    John H. Eickemeyer

Exhibit A

```
                    UNITED STATES BANKRUPTCY COURT
                    SOUTHERN DISTRICT OF NEW YORK


--------------------------------------X
                                      :
In Re:                                :   05-60006
                                      :
           REFCO, INC.,               :   One Bowling Green
                                      :   New York, New York
           Debtors.                   :   June 8, 2006
--------------------------------------X

                    TRANSCRIPT OF HEARING
           BEFORE THE HONORABLE ROBERT D. DRAIN
                 UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For the Debtors:            SALLY HENRY, ESQ.
                            BENNETT S. SILVERBERG, ESQ.
                            Skadden, Arps, Slate, Meagher & Flom
                            Four Times Square
                            New York, New York  10036

For the Creditors Com.:     LUC A. DESPINS, ESQ.
                            ANDREW LEBLANC, ESQ.
                            DENNIS O'DONNELL, ESQ.
                            SUSHEEL KIRPALANI, ESQ.
                            Milbank, Tweed, Hadley & McCloy
                            One Chase Manhattan Plaza
                            New York, New York  10005

For Mr. Varga:              PETER PANTALEO, ESQ.
                            LAURA HADFIELD, ESQ.
                            Simpson, Thacher & Bartlett

For Sphinx:                 DAVID CRICHLOW, ESQ.
                            Pillsbury, Winthrop, Shaw, Pittman
                            1540 Broadway
                            New York, New York  10036

For Masonic Home:           MARC DONATO, ESQ.
                            Bond, Schoeneck & King, PLLC
                            1 Lincoln Center
                            Syracuse, New York  13202
```

(Appearances continued on next page)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

APPEARANCES CONTINUED:

For the Fund:                ALEC OSTROW, ESQ.
                             Stevens & Lee
                             485 Madison  Avenue
                             New York, New York  10022

For Plus Funds:              JERROLD L. BREGMAN, ESQ.
                             Curtis, Mallet-Prevost, Colt & Mosle
                             101 Park Avenue
                             New York, New York  10178

For du Depot:                STEPHEN SHIMSHAK, ESQ.
                             Paul, Weiss, Rifkind, Wharton
                              & Garrison, LLP
                             1285 Avenue of the Americas
                             New York, New York  10019

For RCM Trustee:             TIMOTHY DISEINO, ESQ.
                             Bingham, McCutchen, LLP
                             399 Park Avenue
                             New York, New York  10022

For Merrill, Lynch:          MARC DWORSKY, ESQ.
                             Raymond, James & Rydex

Court Transcriber:           CARLA NUTTER
                             TypeWrite Word Processing Service
                             356 Eltingville Boulevard
                             Staten Island, New York 10312

Proceedings recorded by electronic sound recording,
transcript produced by transcription service

3

```
 1              THE COURT:  Refco.

 2              MS. HENRY:  Good morning, Your Honor.

 3              For the record, my name is Sally Henry.  I'm with

 4   Skadden, Arps, Slate, Meager & Flom, LLP, counsel to Refco,

 5   Inc. and the other Chapter 11 debtors with the exception of

 6   RCM.

 7              One of my colleagues once referred to bankruptcy

 8   court as more akin to IWW wrestling than to boxing and to a

 9   certain extent that's true today because we have a big change

10   in the calendar.

11              Peter Pantaleo, who is counsel for certain

12   affiliates of parties to the first set of motions that is on

13   would like to address the Court first and I agree with him.

14              THE COURT:  All right.

15              Can you give me the most recent agenda letter

16   though?

17              You've already given it to me?

18              Thanks.

19              All right.

20              Mr. Pantaleo, are you all set?

21              MR. PANTALEO:  All set, yes.

22              THE COURT:  Okay.

23              MR. PANTALEO:  Your Honor, good morning and thank

24   you for hearing me, I guess, grossly out of order given the

25   number of matters I imagine you have on the agenda today.
```

90

1  those orders to court.

2                MR. SILVERBERG:  Thank you, Your Honor.

3                MS. HENRY:  Your Honor, do I understand the Court

4  to want to break at this point?

5                THE COURT:  Well, I'm tempted to address the Arch

6  Insurance Company motion.

7                MS. HENRY:  Okay.

8                THE COURT:  Unless they want to -- unless you all

9  want a break.

10                MS. HENRY:  I think Arch is ready to go forward.

11  I spoke to their counsel a short time ago and we are ready to

12  go forward.

13                THE COURT:  Okay.

14                MR. STANDISH:  Good afternoon, Your Honor.  Daniel

15  Standish of Wiley, Rein & Fielding on behalf of Arch Insurance

16  Company.

17                Your Honor, by our motion we seek to obtain the

18  Court's determination whether or not the automatic stay applies

19  to coverage litigation involving the claim that individual

20  defendants in underlying litigation have made against the Arch

21  policy.

22                In particular, we're aware of Your Honor's comments

23  at the time of the hearing of U.S. Specialties motion to

24  advance defense fees and costs, and out of an abundance of

25  caution have opted not to prosecute the declaratory judgment

1   action that was filed in order to obtain a ruling from this
2   court.

3              We submit, Your Honor, that the automatic stay
4   does not apply to the policies at issue in this case for
5   several reasons.  First of all, the coverage dispute that's at
6   issue in the underlying coverage litigation involves insuring
7   agreement A, which is the insuring agreement that applies
8   solely to directors and officers for their direct coverage
9   under the policy.

10             Secondly, Your Honor, there is a very strong
11  priority of payments provision in this particular policy that
12  gives coverage under insuring agreement A priority over other
13  coverage grants in the policy including the coverage grants
14  that would extend to the debtor for indemnification coverage
15  for securities claim coverage.

16             Third, Your Honor, Arch is not seeking to avoid
17  the policy, so the validity of the policy, which we concede
18  would be deemed an asset of the estate, is not at issue in the
19  underlying litigation.  This is a circumstance where Arch is
20  merely seeking to obtain a determination of coverage with
21  respect to certain policy terms and conditions.

22             THE COURT:  Would those terms and conditions apply
23  equally to the entity coverage and the B coverage?

24             MR. STANDISH:  That's uncertain, Your Honor.  Well,
25  they certainly apply cross the board, but there are no claims

92

1  for coverage at this juncture under these so-called insuring

2  agreement B.

3              THE COURT:  But in terms of construing the

4  language of the contract, it's the same language that applies to

5  A, B, and entity?

6              MR. STANDISH:  It would apply to all the insuring

7  agreements.  That's correct, Your Honor.

8              THE COURT:  Okay.

9              MR. STANDISH:  But with respect to those insuring

10  agreements, again, they are subordinated to insuring agreement

11  A, so particularly in the context of this case and just

12  focusing on one of the underlying matters that gives rise to

13  the coverage dispute, the securities litigation that's pending

14  against the individual defendants and with respect to which a

15  request for coverage has been made, alleges that the market cap

16  loss is in the hundreds of millions of dollars.

17              So it's not difficult to foresee a probability at

18  some juncture in the not-too-distant future, there may be

19  settlement demands in that case in Arch, as well as the

20  individual insureds, will need to determine their respective

21  rights and obligations and determine whether or not insuring

22  agreement A applies.

23              And again, insuring agreement A takes precedence

24  over the other insuring agreements in the policy.

25              THE COURT:  Okay.

1            MR. STANDISH:  With respect to even assuming the

2   stay applies, Your Honor, for those reasons we also submit it

3   should be lifted to allow the prosecution of the coverage

4   litigation.  The need for certainty in the context of the

5   ongoing litigation against the individuals that has not been

6   stayed is quite important.  It's important for Arch and the

7   individual insureds to know whether or not there's coverage

8   available for any settlement.

9            It's important for Arch and individual insureds to

10  know whether or not there's coverage available for any defense

11  fees and costs that may incur in connection with the underlying

12  case.  So for those reasons and the need for certainty, we

13  submit that the stay to the extent it applies should be lifted

14  to allow the parties to obtain the certainty.

15           Now, the debtors and certain other of the

16  objectors have suggested that they would be prejudiced by a

17  determination of the coverage issues, and we submit that that's

18  not the case for a variety of reasons.

19           First of all, there's been no suggestion that the

20  individual defendants won't adequately argue and press their

21  views on the coverage issues and the coverage litigation, so

22  the suggestion that the interests in establishing coverage won't

23  be represented would be inaccurate.

24           Second, any future claim that's been suggested or

25  hinted at in these papers is purely hypothetical at this point

94

in time.   There's no clear indication that there actually will be any sort of claim for coverage under the Arch policy under the policy -- under the coverage grants extended to the debtor, so it's purely hypothetical.

Third, Your Honor, there's been a suggestion that the Court should issue an injunction under Section 105, and we submit that request has not been properly teed up.  There has not been an adversary proceeding that has been filed.  There has been no motion for an injunction under Section 105.  And even were the Court to entertain that request, an injunction would be inappropriate here given the nature of the coverage, the very strong priority of payment provision that exists in the primary policy and the fact that what Arch is doing here is not seeking to avoid the coverage.

And in that regard, I'd like to focus on Judge Gerber's decision in _Adelphia_ on remand when he looked at the issues.  What he was concerned about was the insurers pressing their rescission arguments, rescinding the policy, declaring that the policy was voice ab initio.  Arch is not seeking that determination here.  It's simply seeking a determination that the claims under the policy that are presently being pressed by the individual insureds are not covered.  The Arch policy otherwise remains in place subject to its terms and conditions until its expiration on August 11, 2006.

So under those circumstances we submit that this

1  is not a circumstance that warrants the extraordinary issuance

2  of an injunction under Section 105.

3          THE COURT:  Okay.

4          MS. HENRY:  Good afternoon, Your Honor.  Sally

5  Henry on behalf of the Chapter 11 debtors.  The debtors have

6  expressed their concern, I think, in the reply papers.  The

7  concern is that there would be an interference, which -- with

8  that which is potentially a state property.  More specifically,

9  the concern is that there would be this litigation going on,

10 and we recognize that it technically would not bind the

11 debtors, but as a practical matter it could have a great effect

12 on the debtors.

13         As you know, the debtors' cases are only seven

14 months old at this time, and moreover the debtors have a short

15 window under the revised code to get their reorganization plan

16 process completed.  The debtors think it's most important to

17 focus on that at this time, and in balancing the harms I've

18 heard nothing from Arch that shows an immediate timetable that

19 gives them a particular problem, whereas I think the number of

20 issues that the debtors have to address is clear from the

21 nature of the process.

22         THE COURT:  Well, they say that they need -- they

23 may well need at least to have the coverage issue decided

24 promptly, because it may affect not only whether they can be

25 held for a failure to provide coverage or alternatively if they

1 do it under reservation, then they won't be -- they won't have a
2 right to be heard on a settlement or to veto a settlement.
3            MS. HENRY:  Well, yes, but they don't set forth the
4 specific timetable that gives them a particularized problem at
5 this juncture, Your Honor.
6            THE COURT:  Okay.
7            MS. HENRY:  That's the point that the estate is
8 making.
9            THE COURT:  Isn't it likely that at least some of
10 these defendants, some of whom are pretty well heeled, will in
11 any event be putting up the main defense, whereas if I kept the
12 stay in place the issue would have to be decided somewhere?  It
13 would probably be decided here?
14            MS. HENRY:  Eventually these issues would be
15 decided, Your Honor, and it's true that some of these people are
16 extremely wealthy, but other people are people who worked at
17 this company.  I mean, one person worked through this -- to
18 the -- worked for this company around the clock getting the
19 petitions ready to be filed, and I don't believe it's a person
20 of great wealth, so it's not just the people whose, you know,
21 faces are on the front page of The Wall Street Journal.  It's
22 people who work around the clock trying to help this
23 reorganization in its inception.
24            THE COURT:  Okay.  Are they doing that now?
25            MS. HENRY:  I don't believe that there is anyone

1  particularly who is doing that now, Your Honor.  I could be

2  mistaken, but I don't believe that's the case.

3                THE COURT:  Okay.

4                MS. HENRY:  Thank you, Your Honor.

5                THE COURT:  Okay.

6                MR. O'DONNELL:  Your Honor, Dennis O'Donnell,

7  Milbank, Tweed, Hadley & McCloy on behalf of the official

8  committee.  Your Honor, we filed a similar objection making all

9  of the same arguments that the debtor makes, and I won't belabor

10 the point.  We support -- we also oppose the motion and ask the

11 Court not grant it.

12               THE COURT:  Okay.  Is there a time -- oh, I'm

13 sorry.

14               MR. HANNAFAN:  Good morning, Your Honor --

15 afternoon, I guess.  Floyd Hannafan of Michael T. Hannfan &

16 Associates on behalf of Tony Grant.  We also filed objections

17 adopting the debtors and their trustees.

18               THE COURT:  Okay.

19               MR. LEVIN:  Good afternoon, Your Honor.  Ira

20 Levin, Lowenstein & Standler.  I represent the lead plaintiffs

21 in the securities litigation.  I also join in the objections

22 filed by the committee and the debtor.

23               THE COURT:  Is there a timetable in the

24 litigation?  Are you facing some sort of deadline?

25               MR. HANNAFAN:  In the securities litigation, it's

1    ongoing, Your Honor.  Motions to dismiss are scheduled to be
2    filed soon.  My understanding is the briefing will be completed
3    by October of this year.  In our experience, the motion to
4    dismiss briefing can be quite important.  There can be
5    settlement pushes both before and after that briefing is
6    completed, particularly in a case with allegations of
7    substantial market cap loss.

8              So from Arch's perspective, we face the prospect of
9    demands for action on the part of our company, potential
10   allegations of bad-faith failure to do so if we don't respond
11   quickly.  In addition, there's a state law doctrine to the
12   extent Illinois law is deemed to apply to this policy, which
13   was issued to Refco at an Illinois address with Illinois
14   amendments.  There's a doctrine called the Ehlco Liquidating
15   Trust doctrine that requires insurers promptly to file
16   declaratory judgment actions under certain circumstances or
17   risk waiver.

18             We would not want to be subjected to those types
19   of arguments.  That's another temporal consideration that led
20   Arch to conclude it was most prudent in light of potentially
21   applicable state law to seek a prompt adjudication of the
22   parties' rights and obligations.

23             THE COURT:  Okay.  Ms. Henry, is there anything --
24   any point in particular that you're waiting for or some
25   development of some issue that -- at which point this motion

1 would be appropriate to grant?

2        MS. HENRY:  No, Your Honor, there is not.  Rather,
3 the emphasis is on the fact that we do have a very tight
4 timetable for coming up with a consensual plan, and that's where
5 we think the emphasis should be for the estate right now at
6 this time, instead of monitoring this litigation.  In light of
7 the fact of what -- basically what you just heard, I think is
8 that there is no particular timetable for Arch.

9        THE COURT:  Okay.

10        MS. HENRY:  Thank you.

11        THE COURT:  All right.  I have in front of me Arch
12 Insurance Company's motion for relief of the automatic stay to
13 the extent the stay is applicable.  The stay relief that Arch
14 seeks is to prosecute coverage litigation against directors and
15 officers who are beneficiaries of the debtors' D&O policy.  Arch
16 brings the motion out of an abundance of caution, given that
17 the policy also covers the debtor as a beneficiary both in
18 respect of an indemnity obligation as well as entity coverage.
19  However, those two forms of coverage are subordinate to the
20 coverage of the officers and directors.

21        The litigation that Arch would pursue would not be
22 against the debtor, but would be against the directors and
23 officers as a matter of law.  Consequently, any result in that
24 litigation would not be binding as a matter of res judicata or
25 collateral estoppel on the debtors.

100

1       However, a determination would have persuasive
2  effect, because, as Arch acknowledges, the language pertaining
3  to the directors and officers that is at issue in its coverage
4  litigation is the same language that applies to the debtor were
5  it to be a party to the litigation or a subsequent litigation
6  of the same issues.

7       I believe that this lawsuit, since it does seek a
8  construction of the insurance policy as opposed to a lawsuit
9  that deals with proceeds of the policy (which may be a closer
10 question), is subject to the automatic stay, in that it is
11 clear that the policy itself is property of the estate.

12      However, based upon the facts set forth in the
13 motion and in the response and oral argument, I believe that
14 Arch is entitled to relief from the automatic stay for cause,
15 because the balance of the harms in this instance (and clearly
16 so, I believe) is in favor of Arch.  First, as far as the
17 potential harm to Arch is concerned if the stay is not lifted,
18 based on my review of the case law that Arch has cited, as well
19 as other case law, I believe that Arch is at risk of two things
20 if it does not promptly prosecute the coverage action.

21      The first is that, potentially under the Ehlco
22 doctrine laid out in Employer's Ins. of Wausau v. Ehlco
23 Liquidating Trust, 708 N.E.2d 1122, 1138 (Ill. 1999), is that
24 it may not be able to disaffirm coverage if it doesn't promptly
25 challenge the D&O's right to coverage, or bear some other

adverse consequence, such as being found to have improperly
denied coverage.

In addition, it appears to me -- again under
Illinois law -- that if, as would be prudent if I kept the stay
in place, Arch bore the burden of defense with a reservation of
rights as regards to coverage, it appears to me that Arch would
lose its right to consent to or to veto a settlement.  See In
Re:  HA 2003 Inc., 310 BR 710, 724, N. D. Ill. 2004).

So, given the schedule that the securities
litigation is represented to be on, which includes a potential
for serious activity by October including submission of briefs
and, potentially, rulings by the Court, I believe that there is
a fair chance that there will be settlement discussions at that
point.

On the other hand, it's clear that the debtor's
direct interests under the policy are subordinated to the
officers and directors, that the officers and directors are
likely, in addition, to vigorously defend the coverage
litigation in their own stead, and, lastly, while a potential
source to satisfy claims may be reduced as a result of the
litigation, that is an indirect effect on the estate as opposed
to a direct one.  And, indeed, given the lack of any res
judicata or collateral estoppel effect, I believe that the
indirect effect of the litigation, even were Arch to be
successful, is too remote to justify the stay remaining in

102

1  place.

2          Indeed, the Ninth Circuit, faced with a similar

3  issue, ruled in <u>In re: Pintlar Corporation</u>, 124 F.3d 1310 (9th

4  Cir. 1997), that the stay would not apply at all in such a

5  situation.  I disagree with that logic, but do believe that the

6  debtor's interest is so remote that the stay should be lifted

7  here.

8          I don't think I have an order with a disk, so I

9  think you should submit that after running it by Ms. Henry and

10  counsel for the committee.

11          MR. HANNAFAN:  We will, Your Honor.

12          THE COURT:  Okay.

13          MS. HENRY:  Thank you, Your Honor.

14          THE COURT:  Okay.  All right.  It's 1:00.  I'll

15  come back at 2:00 on the motion for the appointment of an

16  equity committee.

17

18

19

20

21

22

23

24

25

103

```
1                          * * * * *

2          I certify that the foregoing is a court transcript from

3    an electronic sound recording of the proceedings in the above-

4    entitled matter, except where, as indicated, the Court has

5    modified its bench ruling.

6

7

8

9                                        Carla Nutter

10   Dated: 6/9/06

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# Exhibit B

02/22/2007 13:05 FAX 212 589 4201    BAKER & HOSTETLER    ☒002/005

## SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT:  ____    HELEN E. FREEDMAN ____                    PART __39__

                                    *Justice*

| | |
|---|---|
| Arch Ins. Co., | |
| **Plaintiff,** | INDEX NO. 600805/06 |
| | MOTION DATE ____ |
| - v - | |
| Phillip R. Bennett et al., | |
| **Defendants** | MOTION SEQ. NO. 005 |
| | MOTION CAL. NO. ____ |

The following papers, numbered 1 to _____ were read on this motion to/for ____

|  | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause · Affidavits — Exhibits ... | |
| Answering Affidavits — Exhibits ____ | |
| Replying Affidavits ____ | |

**Cross-Motion:**   ☐ Yes   ☒ No

*(left margin, rotated:)* MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE FOR THE FOLLOWING REASON(S):

The motions with sequence numbers 001, 002, and 005 are consolidated for joint disposition.

In this lawsuit, plaintiff Arch Insurance Company ("Arch") seeks declaratory judgments that its excess liability insurance policy does not afford coverage to former directors and officers of a now-bankrupt corporation, Refco, Inc. ("Refco, Inc."), and Refco affiliates. Defendants now move for orders dismissing or staying this action primarily on the grounds that it is premature and unripe, and that it should await the outcome of a related criminal trial. For the reasons set forth below, the motions are granted to the extent that the complaint is dismissed without prejudice.

*Background* – Refco, a publicly-traded corporation which provided services to financial markets, collapsed immediately after the company announced on October 10, 2005 that its financial statements failed to disclose that it carried an undisclosed receivable of $ 430 million from an entity that Refco's CEO, Phillip Bennett, controlled. On the following day, Refco announced that the receivable derived largely from uncollectible debt that that third parties owed to Refco.

Refco filed for bankruptcy on October 12. In November 2005, a federal grand jury indicted Bennett on charges of securities fraud and related charges; the indictment alleged that Bennett

sought to hide from, among others, Refco's auditors and investors, losses sustained by Refco through its own and its customers' trading in the financial

Page 1 of 4

markets. To that end, Bennett transferred losses from Refco to a company controlled by Bennett, directed a repeated series of transactions designed to conceal those losses at year- and quarter-end from Refco's auditors and others, and caused Refco to make false and fraudulent public filings with the [SEC].

In addition, Refco shareholders, bondholders, customers, and others have filed at least six civil lawsuits (the "Underlying Lawsuits") which, like the criminal proceeding, accuse Bennett of concealing Refco's bad debt through a series of sham transactions. The defendants in this action are defendants in some or all the Underlying Lawsuits.

*Insurance Policies* – Refco and its affiliates simultaneously held five primary and excess "Directors and Officers" insurance policies that provided one year of coverage beginning on August 11, 2005. The primary carrier, U.S. Specialty Insurance Company ("U.S. Specialty"), covers liability of up to an aggregate of $ 10 million for a number of types of claims. The first tier excess carrier, Lexington Insurance Company ("Lexington"), covers the next $ 7.5 million of liability; Lexington and its insureds dispute whether the policy covers legal defense costs. The second tier excess carrier, Axis Reinsurance Company ("Axis"), covers the next $ 10 million of aggregate liability, inclusive of defense costs. The third tier excess carrier, Allied World Assurance Company ("AWAC"), provides an aggregate liability limit of $ 12.5 million, including defense costs.

The fourth tier excess carrier, plaintiff Arch, issued a policy that limits liability, including defense costs and expenses, to an aggregate of $ 10 million for "Claims." The Arch policy also states that its coverage extends no further than that provided by the most restrictive underlying policy.

Certain defendants have tendered their defense of the Underlying Lawsuits to, and demanded indemnification from, the aforementioned insurers. U.S. Specialty has reserved its rights to deny coverage but has paid or reimbursed several defendants for defense costs totaling about $ 4.9 million as of October 2006. None of the excess coverage has been reached. Lexington initially reserved its rights and denied coverage for defense costs on the ground that its policy did not cover them. However, Lexington later agreed to advance defense costs if defendants agreed to repay them if they were later determined not to be covered.

AWAC denied coverage, in part, based on its policy's "Prior Knowledge Exclusion," which excludes coverage for all of its insureds with respect to claims that arose from circumstances which any insured knew about as of August 11, 2005, if the insured expected or should have expected those circumstances to lead to future insurance claims against AWAC. In addition, the AWAC policy mandates that any coverage disputes under its policy are subject to alternative dispute resolution ("ADR").

Arch responded to defendants' coverage demands by filing this declaratory judgment action. The first count in the amended complaint seeks a declaration that, since Arch's policy incorporates any coverage restrictions in the underlying insurance policies, the AWAC's Prior Knowledge Exclusion bars coverage for the Underlying Lawsuits. Arch asserts that the AWAC Prior Knowledge Exclusion applies because of what Bennett knew as of August 11, 2005.

In the second count, Arch seeks a declaration that the Prior Knowledge Exclusion in its own policy bars coverage, due to Bennett's knowledge as of August 11, 2005.

The third count seeks a declaration that the Arch policy does not cover defense costs because the Lexington policy excludes them.

*Motions: Officer Defendants* – In motion number 001, defendants Tone Grant, Dennis A. Klejna, Joseph Murphy, Perry Rotkowitz, William M. Sexton, Gerald Sherer, Philip Silverman and Robert C. Trosten (the "Officer Defendants") move for an order dismissing the complaint on the ground that no justiciable dispute currently exists between Arch and the movants, because it is unlikely that coverage under the Arch policy will ever be reached. That could not occur until defendants' claims exceed $ 40 million and exhaust the coverage that U.S. Specialty, Lexington, Axis, and AWAC provide.

To maintain a declaratory judgment action, a plaintiff must have an "interest sufficient to constitute standing to maintain the action," and must face "present, rather than hypothetical, contingent or remote, prejudice." *Am. Ins. Assoc. v. Chu*, 64 N.Y.2d 379, 383 (1985). This lawsuit is dismissed as premature because at present the chances of Arch's policy being triggered are too remote. The primary carrier has paid out less than half of its policy limit, and none of the other excess carriers' coverage has been reached. Moreover, Arch fails to show that potential judgments, settlements and defense costs related to the Underlying Lawsuits are likely to exceed $ 40 million. It is particularly unlikely that the movants will incur defense costs that exceed $ 40 million, and accordingly the third count in Arch's complaint, which pertains only to defense costs, is especially unripe.

As an additional ground for dismissal, the Officer Defendants point out that the first and second counts, which invoke the Prior Knowledge Exclusion in the AWAC and Arch policies, are unripe because they are predicated on claims against Bennett that will be determined in the Underlying Lawsuits. "The general rule is that a declaratory judgment as to a carrier's obligation to indemnify may be granted in advance of trial of the underlying tort action only if it can be concluded as a matter of law that there is no factual or legal basis on which the insurer may eventually be held liable under its policy." *First St. Ins. Co. v. J & S United Amusement Corp.*, 67 N.Y.2d 1044, 1046 (1986). If a carrier's obligation to indemnify its insured turns on an issue of fact that the underlying action will determine, the carrier cannot bring a declaratory judgment action to determine the issue. *See Allstate Ins. Co. v. Santiago*, 98 A.D.2d 608, 608 (1st Dept. 1983). Arch seeks a declaration that the Prior Knowledge Exclusion bars coverage because Bennett concealed related party transactions and uncollectible receivables, and accordingly knew that Refco's financial statements were misleading. However, these accusations against Bennett are central to the Underlying Lawsuits and must be adjudicated in those actions.

The Officer Defendants' final argument is that the first count, which invokes the AWAC policy's Prior Knowledge Exclusion, should be dismissed or stayed because litigating Arch's claim would conflict with the Officer Defendants' right to resolve coverage issues with AWAC through ADR. This issue does not need to be reached because the Prior Knowledge Exclusion in the Arch policy, which the second count invokes, does not afford movants a right to ADR, and because the first count is dismissed for other reasons.

*Director Defendants* – In motion number 002, defendants Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, and Scott A Schoen (the "Director Defendants") seek dismissal on the ground that "Arch has ignored that it is contractually obligated to advance defense costs." In support, the Director Defendants cite to *Fed. Ins. Co. v. Kozlowski*, 18 A.D.3d 33 (1st Dept. 2005), in which the Appellate Division

recognized that a liability insurer must pay defense costs as they are incurred, and cannot defer payment because the claims against the insured in the underlying litigation, if proven, would bar coverage. However, the Director Defendants' argument does not provide an independent basis for dismissing the complaint. As discussed above, this action is unripe and it would be premature to determine the merits in favor of Arch or against it. Also, it is unlikely that Arch's obligations to pay defense costs will ever be triggered, and its duty to pay defense costs, if any, has no bearing upon its duty to indemnify defendants in the Underlying Lawsuits.

*Stephen Bennett* – In motion 005, defendant Stephen Bennett separately moves for a stay of this action on the ground that he is being criminally prosecuted, and defending Arch's lawsuit would require him to waive his right against self-incrimination and jeopardize his criminal defense. While it appears that the relevant factors weigh in favor of staying this action until the criminal proceedings against Bennett conclude, this action is being dismissed as premature and accordingly the question of a stay need not be reached.

ORDERED that the motions are granted to the extent that the complaint is dismissed without prejudice, and it is further

ORDERED that the Clerk is directed to enter judgment accordingly.

Dated:   __February 20, 2007__                          _____
                                                         Helen E. Freedman, *J.S.C.*

Check one:   ☒ **FINAL DISPOSITION**        ☐ **NON-FINAL DISPOSITION**
Check if appropriate:      ☐ **DO NOT POST**

# Exhibit C

Hearing Date: August 30, 2007, 10:00 a.m.
Reply Date: August 29, 2007

MATTHEW R. GOLDMAN (MG-0719)
WENDY J. GIBSON
BAKER & HOSTETLER LLP
3200 National City Center
1900 E. 9th Street
Cleveland, OH 44114
Telephone:    216-621-0200
Facsimile:    216-696-0740

HELEN B. KIM (HK-8757)
BAKER & HOSTETLER LLP
333 South Grand Avenue, Suite 1800
Los Angeles, CA 90071-1523
(213) 975-1600 (Telephone)
(213) 975-1740 (Facsimile)
*Attorneys for Defendants Dennis A. Klejna
and Joseph Murphy*

RICHARD CASHMAN (RC-4769)
HELLER EHRMAN LLP
Times Square Tower
7 Times Square
New York, NY 10036-6524
Telephone:    212-832-8300
Facsimile:    212-763-7600
*Attorneys for Defendant Philip Silverman*

STUART I. FRIEDMAN (SF-9186)
IVAN KLINE (IK-9591)
FRIEDMAN & WITTENSTEIN
A Professional Corporation
600 Lexington Avenue
New York, NY 10022
Telephone:    212-750-8700
Facsimile:    212-223-8391
*Attorneys for Defendants William M. Sexton
and Gerald M. Sherer*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x
In re                                                              :      Chapter 11
                                                                   :
                                                                   :      Case No. 05-60006 (RDD)
REFCO INC., et al.,                                                :
                                                                   :      Jointly Administered
                    Debtors.                                       :
                                                                   :
------------------------------------------------------------------ x
                                                                   :
AXIS REINSURANCE COMPANY,                                          :      Adv. Proc. No. 07-01712-rdd
                                                                   :
                    Plaintiff,                                     :
          v.                                                       :
                                                                   :      *Electronically Filed*
PHILLIP R. BENNETT, et al.,                                        :
                                                                   :
                    Defendants.                                    :
------------------------------------------------------------------ x

**OPPOSITION OF DEFENDANTS DENNIS KLEJNA, JOSEPH MURPHY,
WILLIAM M. SEXTON, GERALD SHERER AND PHILIP SILVERMAN TO MOTION
TO INTERVENE OF ARCH INSURANCE COMPANY**

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACTS ........................................................................................... 3

    A.    Background ................................................................................... 3

    B.    The Refco D&O Policies .................................................................... 3

    C.    The Prior Arch Litigation.................................................................... 5

    D.    The Present Adversary Proceeding ......................................................... 7

    E.    Arch's Motion to Intervene.................................................................. 7

ARGUMENT ................................................................................................................ 8

ARCH'S MOTION FOR INTERVENTION UNDER RULE 24(B) SHOULD BE DENIED..... 8

CONCLUSION............................................................................................................. 12

501461634

Defendants Dennis Klejna, Joseph Murphy, William M. Sexton, Gerald Sherer and Philip

Silverman (collectively, the "Officer Defendants"), each a former officer of Refco, Inc. or its

direct or indirect subsidiaries (collectively, "Refco"), submit this Memorandum in opposition to

the motion by Arch Insurance Company ("Arch"), pursuant to Rule 24(b) of the Federal Rules of

Civil Procedure, for entry of an order permitting Arch to intervene as a counterclaim defendant

in the instant adversary proceeding.

### PRELIMINARY STATEMENT

The present adversary proceeding was commenced by Axis Reinsurance Company

("Axis"), the second excess insurer in the tower of Directors and Officers ("D&O") liability

insurance obtained by Refco for the policy period that began in August 2005. Axis seeks a

declaratory judgment that there is no coverage for any of the defendants herein under Axis'

policy (the "Axis Policy"). The Officer Defendants have filed counterclaims against Axis which

seek declaratory and injunctive relief under the Axis Policy. The Officer Defendants have also

filed a motion for an order directing Axis to pay their defense costs while coverage under the

Axis Policy is being litigated in this adversary proceeding.

Arch, the fourth excess insurer in the Refco D&O tower, seeks to intervene as a

counterclaim defendant for the ostensible purpose of opposing the Officer Defendants' motion

for advancement of defense costs. As is apparent from the face of Arch's motion and its

proposed "Reply and Affirmative Defenses" to the Officer Defendants' Counterclaims against

Axis (Arch Motion to Intervene, Exs. B, C, D), Arch's intervention motion is nothing short of

bizarre: The Officer Defendants' Counterclaims assert no claims against Arch and seek no

determination or interpretation of any provision under the Arch policy (the "Arch Policy"). Yet,

Arch seeks to file "Replies" that respond to factual allegations asserted by the Officer

- 2 -

Defendants against Axis (not Arch) and to assert affirmative defenses on behalf of Arch (not Axis) to non-existent claims against Arch. Arch's proposed "Replies" would inject issues that need not and should not be adjudicated as part of this adversary proceeding.

Similarly, and critically for its motion, Arch's moving papers clearly state that Arch seeks to litigate the issue of whether its own policy – and not the Axis Policy – requires advancement of defense costs. However, the Arch Policy is not at issue in this action and the Officer Defendants have not sought advancement under the Arch Policy. For this reason alone, intervention should be denied.

In addition, because it is constrained by an order of the New York State Supreme Court that dismissed as premature an action brought by Arch in 2006, Arch is not seeking to adjudicate herein the ultimate issue of whether there is coverage under the Arch Policy, but instead seeks to oppose advancement of defense costs and to litigate the merits of its prior knowledge exclusion in that context – even though no one is seeking advancement of defense costs against Arch and the New York State Supreme Court made clear that the issue of "prior knowledge" for purposes of the exclusion must be determined in the underlying actions. This procedural gamesmanship by Arch is not only improper, but would result in plain judicial inefficiency and prejudice to the Officer Defendants, as the issue of coverage under the Arch Policy is not pending before any court, and Arch is plainly seeking to have two "bites at the apple" in trying to avoid advancement.

Finally, as Arch itself acknowledges that "Axis and Arch have relied upon different policy provisions in denying coverage" and states that, as a result, different showings will be required in order to obtain advancement, Arch has failed to even make the threshold showing required under Rule 24(b) of a common question of law or fact. Even if Arch has made that

- 3 -

showing, however, it is clear that this Court should exercise its broad discretion under Rule 24(b)

and deny Arch's motion.

**STATEMENT OF FACTS**

**A.**    **Background**

The collapse of Refco in October 2005 and the bankruptcy filings that quickly followed

led to a series of civil lawsuits, government investigations, and criminal proceedings, a number

of which remain pending.  Of particular note, discovery has begun in *In re Refco, Inc. Securities*

*Litigation*, 05 Civ. 8626 (S.D.N.Y.) (the "Securities Litigation"), a class action brought on behalf

of Refco bondholders and shareholders.

As set forth above, the Officer Defendants are former officers of Refco.  Because of their

positions with Refco, each of the Officer Defendants has been named as a defendant in one or

more of several lawsuits arising from the collapse of Refco (the "Underlying Matters"),

including the Securities Litigation, although none of the Officer Defendants has been charged

with any wrongdoing by any governmental body.  The Officer Defendants have tendered the

Underlying Matters to, and/or demanded indemnification from, Refco's insurers.

**B.**    **The Refco D&O Policies**

Refco procured a tower of D&O insurance, consisting of a primary policy and five excess

policies for the policy period of August 11, 2005 to August 11, 2006.  The primary D&O policy

was issued by U.S. Specialty ("U.S. Specialty") with a $10,000,000 limit of liability (the "U.S.

Specialty Policy," or "Primary Policy").  (A copy of the U.S. Specialty Policy is attached as

Exhibit B to the Axis Complaint ("Compl.") in this action.)  Although U.S. Specialty initially

reserved its rights as to coverage, it has paid or reimbursed the defense costs of the insureds with

respect to the Underlying Matters up to its policy limit.

- 4 -

The first excess policy above the U.S. Specialty Policy was issued by Lexington Insurance Company ("Lexington") (the "Lexington Policy," attached to the Complaint as Exhibit C). The limit of liability of the Lexington Policy is $7,500,000 in excess of the $10,000,000 Primary Policy. Lexington initially reserved its rights, and specifically denied coverage for defense costs on the ground that the Lexington policy's definition of "Loss" excluded attorneys' fees and costs. However, Lexington subsequently agreed, subject to a reservation of rights, to voluntarily advance attorneys' fees and costs under the Lexington Policy to insureds who entered into an agreement to repay advances if it was subsequently determined that there was no coverage for defense costs under the U.S. Specialty Policy or the Lexington Policy.[1] As of August 2007, Lexington has paid or reimbursed the defense costs of the insureds with respect to the Underlying Matters up to its policy limit.

Axis issued the second excess policy, with a limit of liability of $10,000,000 above the $17,500,000 in underlying coverage. (*See* Compl. Ex. A.) By letter dated March 6, 2006, Axis asserted various grounds for denying coverage to the insureds for the Underlying Actions. (*See* Compl. Ex. G.)

---

[1] On or about October 17, 2006, defendants Dennis Klejna and Joseph Murphy filed a declaratory judgment action in New Jersey Superior Court against Lexington seeking a declaration that the Lexington Policy covers defense fees and costs. Declaration of Helen B. Kim ("Kim Decl."), dated Aug. 23, 2007, Ex. A at p. 3. Incredibly, Arch now suggests that it was somehow improper for Klejna and Murphy to litigate against Lexington, rather than against Arch, the issue of the construction of the Lexington Policy. (*See* Arch Motion to Intervene ¶ 12.) Plainly, the New Jersey court disagreed. In response to Lexington's motion to this Court for relief from the automatic stay for leave to intervene in the *Arch* action then pending in New York Supreme Court, the New Jersey court preliminarily enjoined Lexington from intervening in the *Arch* action and also denied Lexington's motion to dismiss. Kim Decl. Ex. A at p.3. On August 3, 2007, based on a Stipulation of Law and Facts agreed to by Lexington, Murphy and Klejna, the New Jersey court granted summary judgment in favor of Klejna and Murphy, holding that the Lexington Policy's definition of "Loss" included defense costs and fees. Kim Decl. Ex. B. The New Jersey court also awarded Klejna and Murphy their attorneys fees and costs in litigating the New Jersey action. *Id.* at pp. 2-3.

Arch also wrongly contends that the Officer Defendants took inconsistent positions on "ripeness" (*see* Arch Motion to Intervene ¶ 12). The Officer Defendants did no such thing. The Officer Defendants contended – and the New York court agreed – that the coverage lawsuit by *Arch*, the fourth excess insurer, was not ripe. But neither the insureds nor Lexington ever contended that the issue of whether the Lexington Policy covered defense costs was not ripe as to *Lexington*, the first excess insurer. Kim Decl. Ex. C.

The third excess carrier is Allied World Assurance Company ("AWAC"), with a policy providing a limit of liability of $12,500,000 (the "AWAC Policy") in excess of $27,500,000 in underlying insurance. Although AWAC has also denied coverage, in part based upon Endorsement No. 3 to the AWAC Policy, its "Prior Knowledge Exclusion," the AWAC Policy contains a provision that mandates alternative dispute resolution between the Insureds and AWAC with respect to disputes over provisions in the AWAC Policy.

As indicated above, Arch is the fourth excess carrier on the Refco D&O insurance tower, with a policy limit of liability of $10 million in excess of $40 million in underlying insurance.

### C.    The Prior Arch Litigation

On or about March 9, 2006, Arch commenced an action in the New York Supreme Court seeking a declaratory judgment that the Arch Policy "affords no coverage for [insureds] in connection with the Underlying Matters" (the "Arch action"). In addition to the Arch Policy, Arch invoked provisions of both the Lexington and AWAC policies in alleging no coverage. Notably, Arch did not rely upon any provision of the Axis Policy in its declaratory judgment action.

The first count in the *Arch* action sought a declaratory judgment that the "prior knowledge" exclusion in the AWAC Policy barred coverage for the Underlying Matters under the Arch Policy, based upon the Arch Policy's incorporation of any "terms and conditions in . . . any other underlying insurance 'further limiting or restricting coverage.'" (Jacobs Decl. Ex. 3, at ¶¶ 24, 76-79.) Arch asserted that the AWAC Policy's prior knowledge exclusion should apply due to facts and circumstances allegedly known to Bennett as of August 11, 2005, the policy inception date. (*Id.* at ¶ 77.)

Arch's second count sought a declaratory judgment that the "prior knowledge" exclusion in the Arch Policy also barred coverage for any loss arising out of the Underlying Matters. (*Id.* at ¶¶ 80-83.) As with the AWAC "prior knowledge" exclusion, Arch alleged that its own prior knowledge exclusion applied due to facts and circumstances allegedly known to Bennett as of August 11, 2005. (*Id.* at ¶ 81.) Notably, Arch's complaint did not assert the existence of, or seek to invoke, a "prior knowledge" exclusion in the Axis Policy.

Arch's third count for declaratory relief alleged that the Lexington Policy did not provide any coverage for defense costs, and that the Arch Policy also thus provided no coverage for such costs incurred by the insureds in connection with the Underlying Matters. (Jacobs Decl. Ex. 3, at ¶¶ 84-88.)[2]

In September 2006, the defendant insureds filed motions to stay and/or dismiss the Arch action. Each of the Officer Defendants moved to dismiss the action on multiple grounds, including for failure to allege a justiciable controversy because the action was premature. (*See* Jacobs Decl. Ex. 5, at pp. 1-10.) On February 20, 2007, Justice Freedman granted the motion and dismissed Arch's entire action without prejudice "as premature because at present the chances of Arch's policy being triggered are too remote." (*See id.* Ex. 6, at p. 3.) As an additional ground for dismissal, the court held that the first and second counts of the Arch complaint, invoking the "prior knowledge" provisions of the AWAC and Arch policies, were not ripe because such counts were "predicated on claims against Bennett that will be determined in the Underlying Lawsuits." (*Id.*) Arch did not appeal from Justice Freedman's February 20, 2007 order (the "Dismissal Order").

---

[2]  As noted above, litigation in New Jersey to which Lexington was a party has now established that the Lexington Policy does cover defense costs.

### D.    The Present Adversary Proceeding

On May 24, 2007, Axis commenced the instant adversary proceeding, seeking a

declaration that its policy does not provide coverage for the Underlying Actions for any of the

insureds.[3]  On or about July 12, 2007, each of the Officer Defendants filed an Answer to the Axis

Complaint and asserted Counterclaims for declaratory and injunctive relief under the Axis

Policy.[4]  The Counterclaims request (1) a declaration that none of the grounds in the Complaint

provides Axis with a valid basis for refusing coverage and (2) permanent injunctive relief

requiring Axis to make payments in accordance with Axis' contractual obligations.

Also on July 12, 2007, the Officer Defendants filed a motion for an order to compel Axis

to pay defense costs in the Underlying Matters upon the exhaustion of the Lexington Policy (the

"Advancement Motion").[5]  Axis filed papers in opposition to the Advancement Motion on or

about August 13, 2007.

### E.    Arch's Motion to Intervene

On or about August 10, 2007, Arch filed its motion to intervene in the present adversary

proceeding pursuant to Rule 24(b) of the Federal Rules of Civil Procedure.  In an attempt to

avoid violating Justice Freedman's Dismissal Order, Arch expressly states that it "does not seek

to adjudicate herein the question of whether there is coverage for the Underlying Matters under

the Arch Policy." (Arch Motion to Intervene, at ¶ 3.)  Rather, "Arch seeks to intervene as a

defendant to the Officer Defendants' counterclaims to the limited extent that the Officer

---

[3]   Specifically, the Axis Complaint seeks to avoid coverage under the Axis Policy for all Insureds on four grounds:
(1) Count I of the Complaint relies on a January 14, 2005 letter signed by Phillip Bennett ("Bennett") as the
President and CEO of Refco Group Ltd., LLC; (2) Count II of the Complaint relies on Bennett's failure to answer a
question in the application for coverage submitted to U.S. Specialty; (3) Count III of the Complaint relies on a
purported "Knowledge Exclusion Endorsement" to the Axis Policy; and (4) Count IV of the Complaint relies upon
Clause XI of the Axis Policy.  Although the Officer Defendants have moved for advancement under the Axis Policy,
no portion of the Axis Policy has yet been tapped in connection with the Underlying Matters.

[4]   On August 1, defendants Dennis Klejna and Joseph Murphy filed an Amended Answer and Counterclaims.

[5]   Defendants Phillip Bennett, Tone Grant and Robert Trosten joined in the Advancement Motion.

Defendants seek to force the advancement of defense expenses prior to the adjudication of the coverage issues." (*Id.* at ¶ 2.) In other words, Arch seeks to intervene only on the issue of advancement.

However, Arch seeks to oppose advancement under the *Arch* Policy – not the *Axis* Policy – notwithstanding the fact that the Officer Defendants have never sought advancement under the Arch Policy and have moved for advancement of defense costs solely under the Axis Policy. (*See* Arch Motion ¶¶ 15, 18-19.)

## ARGUMENT

### ARCH'S MOTION FOR INTERVENTION
### UNDER RULE 24(B) SHOULD BE DENIED

Rule 24(b) of the Federal Rules of Civil Procedure provides for permissive intervention. Under Rule 24(b) "anyone *may* be permitted to intervene in an action . . . when an applicant's claim or defense and the main action have a question of law or fact in common." (Emphasis added.) "Permissive intervention . . . is discretionary with the trial court" and such "discretion . . . is very broad." *H.L. Hayden Co. of New York, Inc. v. Siemens Med. Sys., Inc.,* 797 F.2d 85, 89 (2d Cir. 1986). "In fact, 'a denial of permissive intervention has virtually never been reversed.'" *Id.* (quoting *United States v. Hooker Chemicals & Plastics Corp.,* 749 F.2d 968, 990 n.19 (2d Cir. 1984)).

Denial of Arch's motion to intervene is plainly warranted for multiple reasons under the facts here. To begin, by its motion, Arch seeks to oppose the advancement of defense costs under the *Arch* Policy in connection with the Underlying Matters. *See* Arch Motion to Intervene ¶ 15 ("Arch seeks to intervene to litigate the issue whether the Arch Policy requires Arch to advance defense costs pending a final judicial declaration as to coverage issues"). However, the Officer Defendants have never sought advancement under the Arch Policy. In fact, an additional

- 9 -

$22.5 million in coverage on the Refco D&O tower must be exhausted before the Arch Policy

will even begin to be accessed. There is simply no reason why the Officer Defendants, whose

motion for advancement was made solely in connection with the Axis Policy, should now be

forced by Arch to litigate the separate, non-ripe issue of advancement under the Arch Policy.

*See Continental Casualty Co. v. ZHA, Inc.*, 154 F.R.D. 281, 283 (M.D. Fla. 1994) (denying

permissive intervention to general liability insurer where the general liability insurer was not a

party to a contract between the professional liability insurer and insured that was at issue in the

case, and the question of responsibility under such contract would not be determinative as to

whether the general liability insurer had liability under its own, separate policies).

By its own argument, Arch's attempt to litigate the issue of advancement under the Arch

Policy is also procedurally improper because there is no underlying claim for relief against Arch

to support a claim for advancement of defense costs against Arch. Arch avers in its proposed

papers in opposition to the Officer Defendants' Advancement Motion (Arch Motion to Intervene,

Ex. A at p. 20.) that inasmuch as an advancement motion is in the nature of a motion for

preliminary injunctive relief, there must be an underlying claim for relief to support a claim for

advancement of defense costs. Here, none of the Officer Defendants or any of the other

individual Insureds have asserted any pleading seeking affirmative relief against Arch in this

adversary proceeding. Nor has Arch filed any pleading against the Insureds (which would

violate Justice Freedman's Dismissal Order, in any event). Accordingly, by Arch's logic, on that

ground alone, Arch's attempt to intervene for the purpose of opposing a non-existent claim for

advancement of costs against Arch would be improper.

Arch's motion should also be denied because it is plainly attempting an "end run" around

the Dismissal Order in its New York action, which held that the Officer Defendants do not yet

- 10 -

have to litigate with Arch over the Arch Policy. As Arch concedes in its Motion, the New York

Supreme Court held that "[t]he facts necessary to adjudicate application of the Arch Prior

Knowledge Exclusion were 'central to the Underlying Matters and must be adjudicated in those

actions.'" Arch Motion to Intervene, ¶ 11. The New York Supreme Court's Dismissal Order is

*res judicata* as to Arch, and Arch thus has no right now to litigate the merits of the Arch prior

knowledge exclusion in this action, either in the context of ultimate coverage or in the context of

an advancement motion.

Moreover, because Arch is not seeking to have the issue of coverage under the Arch

Policy adjudicated here, its motion would result in obvious judicial inefficiency by forcing two

separate adjudications of issues raised by the policy – one in the context of advancement and the

other on the issue of actual coverage. Such a result, contrary to Arch's contention, would also

clearly prejudice the Officer Defendants, who may have to bear the costs of litigating with Arch

twice. Further, Arch would be given "two bites at the apple." If this Court were to now rule that

advancement would be required under the Arch Policy if hereafter sought by the Officer

Defendants, Arch would no doubt then seek to litigate coverage under its policy in another

forum, and try to use a favorable ruling to avoid the obligation to advance defense costs.

In contrast, Arch would not be prejudiced by a denial of its motion to intervene because it

would be able to fully litigate the issue of advancement under the Arch Policy if and when that

issue is raised in another proceeding. While Arch argues that Axis cannot adequately represent

Arch's interests (Arch Motion ¶ 19), it does so only with respect to issues under the Arch Policy

which, absent Arch's motion being granted, will not be litigated in this action. Arch cannot and

does not argue that Axis is incapable of adequately representing its own interests in opposing

advancement under the Axis Policy.

- 11 -

Arch further asserts that it "easily satisfies the requirement . . . that its claim and the existing action share a "common question of law or fact." (*See* Arch Motion ¶ 18.) However, Arch itself acknowledges that "Axis and Arch have relied upon different policy provisions in denying coverage" and states that, as a result, different showings will be required in order to obtain advancement. (*See id.* ¶ 19.) While Arch and Axis may share a "common interest" as insurers in opposing advancement motions, such interest does not satisfy the threshold showing required under Rule 24(b) of a common question of law or fact. *See County of Chautauqua v. International Insurance Company*, No. CIV-88-557E, 1989 WL 13461 *2 (W.D.N.Y. Feb. 15, 1989) ("mutual self-interest" between plaintiff and proposed intervenor in plaintiff succeeding on its claim was not sufficient to satisfy the prerequisites of permissive intervention); *Kheel v. Am. Steamship Owners Mutual Protection & Indemnity Assoc.*, 45 F.R.D. 281, 284 (S.D.N.Y. 1968) (stating that "[t]he mere existence of a third person's interest in the outcome of pending litigation is insufficient to warrant intervention" and citing to the possibility of creating "complication and confusion" in denying permissive intervention).

Finally, Arch has not cited to a single case granting intervention under facts remotely similar to those presented here. In fact, in two of the three cases cited in Arch's moving papers, the Second Circuit affirmed the district court decisions *denying* permissive intervention. *See D'Amato v. Deutsche Bank*, 236 F.3d 78, 84 (2d Cir. 2001); *H.L. Hayden Co. of New York, Inc.*, 797 F.2d at 87, 89. In the third case cited by Arch, *International Design Concepts, LLC v. Saks Inc.*, 486 F. Supp. 2d 229, 235 (S.D.N.Y. 2007), the non-party's motion under Rule 24(b) to intervene as a party-plaintiff was granted, but the court specifically noted there that "defendants [had] *no objection* to the permissive joinder." (Emphasis added.) Moreover, the case is not at all

- 12 -

factually on point, as, among other things, the proposed intervenor plaintiff was the licensor of the plaintiff.

### CONCLUSION

For all of the foregoing reasons, the Court should exercise its broad discretion and deny Arch's motion to intervene as a counterclaim defendant in the present adversary proceeding against Axis. Specifically, the Officer Defendants respectfully request that the Court: (1) deny Arch permission to intervene as a counterclaim-defendant and reject Arch's pleadings in intervention; (2) reject Arch's memorandum in opposition to the Officer Defendants' Advancement Motion; and (3) disallow Arch from being heard at the August 30, 2007 hearing on the Advancement Motion.

Dated:  August 23, 2007

Respectfully submitted,

MATTHEW R. GOLDMAN (MG-0719)
WENDY J. GIBSON
BAKER & HOSTETLER LLP

/s/ Matthew R. Goldman
Matthew R. Goldman
3200 National City Center
1900 E. 9th Street
Cleveland, Ohio 44114
Telephone:  (216) 621-0200
Facsimile:  (216) 696-0740

HELEN B. KIM (HK-8757)
BAKER & HOSTETLER LLP
333 South Grand Avenue, Suite 1800
Los Angeles, CA 90071-1523
Telephone:  (213) 975-1600
Facsimile :  (213) 975-1740
*Attorneys for Defendants*
*Dennis A. Klejna and Joseph Murphy*

STUART I. FRIEDMAN (SF-9186)
IVAN KLINE (IK-9591)

- 13 -

STUART I. FRIEDMAN (SF-9186)
IVAN KLINE (IK-9591)
FRIEDMAN & WITTENSTEIN
A Professional Corporation

/s/ Ivan Kline
600 Lexington Avenue
New York, NY 10022
Telephone:  (212) 750-8700
Facsimile:  (212) 223-8391
*Attorneys for Defendants William M. Sexton*
*and Gerald M. Sherer*


RICHARD CASHMAN (RC-4769)
HELLER EHRMAN LLP

/s/ Richard Cashman
Richard Cashman
Times Square Tower
7 Times Square
New York, NY 10036-6524
Telephone:  (212) 832-8300
Facsimile:  (212) 763-7600
*Attorneys for Defendant Philip Silverman*

- 14 -

**CERTIFICATE OF SERVICE**

A copy of the foregoing has been served by fax, personal delivery, or email, on August 23, 2007, on the attached service list.

/s/ Matthew R. Goldman
Matthew R. Goldman

J. Gregory Milmoe
Skadden, Arps, Slate, Meagher & Flom LLP
Four Time Square
New York, NY 10036-6522
(212) 735-3000 (Telephone)

Steven Wilamowsky
Bingham McCutchen
399 Park Avenue
New York, NY 10022-4689
(212) 705-7960 (Telephone)
(212) 752-5378 (Facsimile)

Andrew D. Velez-Rivera
Office of the U.S. Trustee
33 Whitehall Street, Suite 2100
New York, NY 10004
(212) 510-0500 (Telephone)
(212) 668-2255 (Facsimile)

Robert M. Novick
Jeffrey R. Gleit
Kasowitz Benson Torres & Friedman LLP
1633 Broadway
New York, NY 10019
(212) 506-1700 (Telephone)

Wayne E. Borgeest
Joan M. Gilbride
Robert A. Benjamin
Kaufman Borgeest & Ryan LLP
200 Summit Lake Dr.
Valhalla, New York 10595
(914) 741-6100 (Telephone)
(914) 741-0025 (Facsimile)

Stuart I. Friedman
Ivan Kline
Friedman & Wittenstein
600 Lexington Avenue
New York, NY 10022
(212) 750-8700 (Telephone)
(212) 223-8391 (Facsimile)

Richard Cashman
Chakshu S. Patel
Heller Ehrman LLP
Times Square Tower
7 Times Square
New York, NY 10036-6524
(212) 832-8300 (Telephone)
(212) 763-7600 (Facsimile)

Luc A. Despins
Milbank, Tweek, Hadley & McCloy LLP
1 Chase Manhattan Plaza
New York, NY 10005
(212) 530-5000 (Telephone)

Donald S. Bernstein
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017
(212) 450-4000 (Telephone)

Timothy B. DeSieno
Mark W. Deveno
Bingham McCutcheon LLP
399 Park Avenue
New York, NY 10022-4689
(212) 705-7000 (Telephone)

Susheel Kirpalani
Quinn Emanuel Urquhart Oliver & Hedges LLP
51 Madison Avenue
New York, NY 10017
(212) 849-7000 (Telephone)

Jeffrey T. Golenbock
Golenbock Eiseman Assor Bell & Peskoe LLP
437 Madison Avenue
New York, NY 10022
(212) 907-7300 (Telephone)
(212) 754-0330 (Facsimile)

Scott E. Hershman
Stephen R. Blacklocks
Richard Soto
Hunton & Williams LLP
200 Park Avenue
New York, NY 10166
(212) 309-1000 (Telephone)

Greg A. Danilow
Paul A. Ferrillo
Weil Gotshal & Manges LLP
767 Fifth Avenue, 35th Floor
New York, New York 10153
(212) 310-8372 (Telephone)
(212) 310-8007 (Facsimile)

Barbara Moses
Rachel Marissa Korenblat
Morvillo, Abramowitz, Grand, Iason, Anello &
Bohrer, P.C.
565 Fifth Avenue
New York, NY 10017
(212) 856-9600 (Telephone)
(212) 856-9494 (Facsimile)

Gabriel Del Virginia
Law Offices of Gabriel Del Virginia
641 Lexington Avenue, 21st Floor
New York, New York 10022
(212) 371-5478 (Telephone)
(212) 371-0460 (Facsimile)

Daniel J. Standish
Jonathan M. Jacobs
Cara T. Duffield
Wiley Rein LLP
1776 K Street NW
Washington DC 20006
(202) 719-7000 (Telephone)
(202) 719-7049 (Facsimile)

Laura E. Neish
Norman L. Eisen
Thomas G. Macauley
Zuckerman, Spaeder LLP
1540 Broadway, Suite 1604
New York, NY 10036-4039
(212) 704-9600 (Telephone)
(212) 704-4256 (Facsimile)

Blake Tyler Hannafan
Michael T. Hannafan & Associates, Ltd.
One East Wacker Drive, Suite 1208
Chicago, IL 60601
(312) 527-0055 (Telephone)
(312) 527-0220 (Facsmile)

Dylan G. Trache
Wiley Rein LLP
7925 Jones Branch Drive
McLean, VA 22102
(703) 905-2800 (Telephone)
(703) 905-2820 (Facsimile)

101821827

Exhibit D

```
                    UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF NEW YORK

------------------------------------X
                                    :
In Re:                              :  05-60006
                                    :
     REFCO, LLC,                    :
                                    :
            Debtor.                 :
------------------------------------X
                                    :
AXIS REINSURANCE COMPANY,           :  07-1712
                                    :
            Plaintiff,              :
                                    :
            v.                      :  One Bowling Green
                                    :  New York, New York
BENNETT, et al.,                    :
                                    :  August 30, 2007
            Defendants.             :
------------------------------------X
```

                    TRANSCRIPT OF HEARING ON MOTIONS
                 BEFORE THE HONORABLE ROBERT D. DRAIN
                    UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Klejna/Murphy:          MATTHEW R. GOLDMAN, ESQ.
                            HELEN B. KIM, ESQ.
                            Baker & Hostetler LLP
                            3200 National City Center
                            1900 East 9th Street
                            Cleveland, Ohio  44114-3485

For Director Defendants:    MICHAEL F. WALSH, ESQ.
                            SCOTT E. COHEN, ESQ.
                            Weil, Gotshal & Manges LLP
                            767 Fifth Avenue
                            New York, New York  10153-0119


For Axis Reinsurance:       JOAN M. GILBRIDE, ESQ.
                            WAYNE BORGEEST, ESQ.
                            ROBERT A. BENJAMIN, ESQ.
                            Kaufman, Borgeest & Ryan LLP
                            200 Summit Lane Drive
                            Valhalla, New York 10595


                            (Appearances continue on next page.)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

APPEARANCES CONTINUED:

For Defendants Schoen,      PAUL FERRILLO, ESQ.
   Jaekel Lee, Harkins,     Weil, Gotshal & Manges LLP
   Brightman, O'Kelly       767 Fifth Avenue
   and Gantscher:           New York, New York  10153-0119

For Phillip Silverman:      RICHARD CASHMAN, ESQ.
                            Times Square Tower
                            7 Times Square
                            New York, New York  10036-6524

For Tone Grant:             NORMAN L. EISEN, ESQ.
                            Zuckerman Spaeder LLP
                            1800 M Street NW, Suite 1000
                            Washington, D.C.  20036-5802

For Phillip Bennett:        DEBORAH ADLER, ESQ.
                            Golenbock, Eiseman, Assor,
                               Bell & Peskoe LLP
                            457 Madison Avenue
                            New York, New York  10022

For Arch Insurance:         DANIEL STANDISH, ESQ.
                            Wiley Rein LLP
                            1776 K Street NW
                            Washington, D.C.  20006

For Robert Trosten:         RACHEL M. KORENBLAT, ESQ.
                            Morvillo, Abramowitz, Grand,
                               Jason, Anello & Bohren, PC
                            565 Fifth Avenue
                            New York, New York  10017

(Appearances continue on next page.)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

APPEARANCES CONTINUED:

For Sexton and Sherer:    IVAN O. KLINE, ESQ.
                          Friedman & Wittenstein
                          600 Lexington Avenue
                          New York, New York  10022

Court Transcriber:        RUTH ANN HAGER
                          TypeWrite Word Processing Service
                          356 Eltingville Boulevard
                          Staten Island, New York 10312

Proceedings recorded by electronic sound recording,
transcript produced by transcription service

4

1   (Proceedings began at 10:20 a.m.)

2            THE COURT:  Okay.  Refco and the Axis Reinsurance

3   matters.

4                  [Pause in the proceedings.]

5            MR. GOLDMAN:  Good morning, Your Honor.

6            THE COURT:  All right.  There are a number of

7   matters on that generally come under the heading of the Axis

8   Reinsurance matters.

9            Have the parties discussed any particular order

10  that they want to proceed in?

11           MR. GOLDMAN:  Good morning, Your Honor.  Matthew

12  Goldman, Baker & Hostetler.  I will be speaking on behalf of

13  what we have called the moving defendants, the parties seeking

14  a preliminary injunction for advancement of defense costs.

15           Yes, I have spoken with Joan Gilbride -- yeah.  I

16  have spoken with Joan Gilbride.  I believe at least insofar as

17  Axis and the other moving defendants are concerned, the

18  appropriate procedure would be that this Court first determine

19  whether or not Arch should be permitted to intervene so that we

20  can determine whether or not they would be heard.

21           THE COURT:  Right.  I agree with you.

22           MR. GOLDMAN:  Our suggestion --

23           THE COURT:  I'd go with that first.

24           MR. GOLDMAN:  Okay.  Thank you, Your Honor.  Then

25  our suggestion would be that we proceed with the motion to

5

1  advance defense costs, the motion to file by the motions to

2  dismiss or to stay. And insofar as the lift stay motions are

3  concerned, there is no objection to lifting the stay to the

4  extent that it is applicable to deal with the defense cost

5  issues. That's not in dispute at all. The only thing that is

6  potentially at issue in the lift stays in my supplemental

7  motion asking for permission to also enter into settlements.

8  We can put that at the end because nothing about the lift stay

9  interferes with this argument.

10      THE COURT: Okay. I appreciate that probably a

11  fair amount of thought went into that order of proceeding and

12  perhaps some tactical considerations, too, but it strikes me

13  given the lack of any opposition, except the limited amount to

14  the part of the lift stay motion that it ought to be be lifted

15  for all purposes, that I should hear the motion to dismiss

16  first and then deal with the issue of advancing defense costs,

17  particularly since the debtor doesn't seem to care about that

18  and it appears to be no dispute because they haven't taken any

19  position whatsoever on this and they've not opposed lifting the

20  stay.

21      MR. GOLDMAN: Your Honor, I didn't actually say

22  it's that material in that order.

23      THE COURT: Okay.

24      MR. GOLDMAN: So, yeah, if the Court wishes to do

25  dismissal first, that is fine with us, Your Honor.

1           THE COURT:   Okay.   That's fine.

2           MR. GOLDMAN:   All right.   So I think then that

3   means that we start with intervention?

4           THE COURT:   So I need to hear from Arch, then,

5   first.

6           MR. GOLDMAN:   Thank you, Your Honor.

7           MR. STANDISH:   Good morning, Your Honor.   Daniel

8   Standish of Wiley Rein on behalf of Arch Insurance Company.

9           Your Honor, we seek to intervene in this case for

10  the limited purpose of opposing the request for the advancement

11  of defense costs notwithstanding the existence of a coverage

12  defense that bars coverage for the claim in its entirety.

13          Arch is in the same tower of insurance as Axis.

14  Arch has the policy that is ten million dollars excess of 40

15  million dollars.   At this point, the underlying limits have

16  been depleting rapidly.   We understand that the burn rate at

17  this juncture is about two million dollars a month.

18          The demand is that the officer defendants in this

19  case have made that Axis pay for their defense fees and costs

20  on an as-incurred basis notwithstanding the existence of a

21  threshold defense.   That is an issue that will affect Arch, as

22  well, in two different ways.   One, it will affect the amount of

23  the policy limits that remain under the Arch layer, as well as

24  affect Arch's rights potentially as a precedential matter if and

25  when Arch's policy is reached, which at this point given the

1  burn rate at least the amounts incurred would certainly
2  implicate that level.  So for that reason, Arch has a very
3  strong interest of that particular issue.

4         Arch also feels strongly about intervening in this
5  case because as Your Honor may recall in June of 2006 Your
6  Honor gave leave for Arch to file its declaratory judgment
7  action in New York Supreme Court in order to obtain an
8  adjudication of the coverage issues.  Your Honor found that
9  Arch would be prejudiced if it were unable to do so.

10        Once we got before Justice Freedman, the officer
11 defendants who are now demanding that Axis advance defense fees
12 and costs argued to Justice Freedman that the Arch suit should
13 be dismissed without prejudice, because it was totally
14 speculative whether or not the erosion of the underlying layers
15 would ever occur and Arch's policy would be implicated.  And
16 even if it did implicate Arch's layer, Arch could simply stand
17 on its denial and refuse to pay, thus directly contrary to the
18 position that they've now taken before this court in demanding
19 advancement.

20        So for that reason, we feel that Arch's interest --
21        THE COURT:  That wasn't the only reason they
22 opposed it, right?

23        MR. STANDISH:  That was not the only reason.
24 That's correct, Your Honor.  There was also an argument that it
25 would overlap with the underlying facts at issue in the

1 criminal prosecution going forward.

2          But Justice Freedman specifically did not reach
3 the issue of whether or not the insurers could be obligated to
4 include advance defense fees and costs notwithstanding the
5 existence of a threshold coverage defense.

6          Arch has moved promptly to intervene, Your Honor.
7 We've briefed this contemporaneously.  We filed with our
8 intervention papers our opposition to the request for
9 advancement and we don't feel that any of the defendants would
10 be prejudiced by the intervention.  In fact, it would be far
11 more efficient to adjudicate this issue in the context of the
12 same proceeding than have it litigated again at some future
13 juncture against Arch in a separate pleading.

14          So for that reason, Your Honor, we submit that
15 permissive intervention is appropriate here and should be, Arch
16 should be permitted to be in for this purpose.

17          THE COURT:  But it's not necessarily the same
18 issue, is it?

19          MR. STANDISH:  With respect to the primary policy
20 language it is, Your Honor.  Both the Axis policy and the Arch
21 policy incorporate by reference the language on which the
22 officers are relying for the advancement of defense fees and
23 costs.  They're focusing in the primary policy in condition (d)
24 that says that the insurer shall advance the covered advanced
25 costs on an as-incurred basis.  The dispute over whether or not

9

the advancement of covered advanced costs is required when the
policy excludes the defense costs is the same issue as to both
Axis and Arch.

The only distinction is in the policy provisions
on which Arch and Axis are relying for the denial of coverage.
Arch has its own prior knowledge exclusion in its policy and
there is no dispute in that case that that exclusion exists and
that it applies.  There's a dispute in the Axis case over
whether or not the exclusion actually is in the policy.  Axis
obviously takes the position that it is, but that dispute
doesn't exist as to Arch.

But with respect to the primary policy language,
the question of whether advancement of "covered defense costs"
means you have to advance uncovered defense costs is precisely
the same.

THE COURT:  Okay.

MR. STANDISH:  Thank you, Your Honor.

MR. KLINE:  Good morning, Your Honor.  Ivan Kline
from Friedman & Wittenstein in New York.

We represent in this action two of the officer
defendants, William Sexton and Sherer, arguing against the
intervention on behalf of them as well as defendants Klejna,
Murphy and Silverman, who are the five sort of moving insureds
on the advancement motion.

And even assuming there is some common question of

1  law, this is clearly a case where the Court should exercise its
2  discretion to deny the motion.  This case is about coverage
3  under the Axis policy, not the Arch policy.  We've asserted a
4  counterclaim against Axis; under the Axis policy we have not.
5  They are not mentioned or in any way involved the Arch policies
6  and we've made an advancement motion solely as against Axis
7  because its policy is now the one that's up, so to speak.

8               We have no claims against Arch.  We haven't asked
9  for advancement against Arch.  Arch wants to litigate not just
10 advancement in the abstract.  It specifically says it wants to
11 intervene to litigate whether the Arch policy requires Arch to
12 advance defense costs, but nobody's made that request, so I
13 don't know against whom they're going to litigate that, because
14 we haven't made the motion.  So procedurally there is a flaw in
15 what they seek to do, because nobody is seeking relief against
16 Arch, so they can't really be heard on an issue of when their
17 policy requires advancement of defense costs.  In fact, they
18 rely very clearly on a specific provision of their policy,
19 which we have not briefed, we have not addressed because we
20 have no claims against them.

21              There's also a procedural flaw which their own
22 proposed opposition brief sets out and that they didn't address
23 in their reply when we pointed it out.  They state in their
24 proposed brief and in opposing advancement that in order for
25 there to be an advancement motion, there has to be an

11

underlying claim to support the request for relief, which advancement would go with. For example, the five moving insureds have counterclaims against Axis and it's those counterclaims with declaratory injunctive relief that support our request for advancement.

Arch points that out because it says others aren't really empowered to advancement anyway, but then it still seeks to adjudicate advancement under its policy just by itself without being hooked on in any way to any claim by or against it. And it's created its own procedural conundrum. It recognized it can't come in here to seek to intervene and litigate coverage under the policy, because that would be barred by Justice Freedman's order. So instead they're seeking just to litigate this advancement issue, but you can't really litigate that in the abstract by itself without the "coverage" under the policy also being in dispute. They themselves state that in their proposed opposition brief.

In terms of the other procedural flaw would be if Your Honor granted that intervention, you know, then what? We haven't made a motion against Arch, so how can Your Honor adjudicate whether advancement is required under the Arch policy when we haven't briefed it, and we have no intention at this point of briefing it, and may never have to brief it.

And in terms of judicial efficiency, some court is going to have the coverage dispute against Arch unless it, you

12

1  know, goes away due to one cause or another.  It's not going to
2  be this court, because by their own statement they can't come in
3  here now to seek to adjudicate coverage.  So to have this court
4  somehow rule in the abstract on advancement under the Arch
5  policy simply makes no sense when some other court will have
6  the coverage issue.  And in both cases they're going to be
7  raising the prior knowledge exclusion in their policy as the
8  key provision to look at.

9         Now, clearly for purposes of efficiency, if we
10 ever want to seek advancement under the Arch policy, we'll have
11 to do something.  We'll have to do it in some court where
12 coverage is also at issue.  And in terms of what Arch's counsel
13 said we're already inconsistent positions, advancement was not
14 an issue before this.

15        THE COURT:  Oh, you don't have to get into that
16 one.

17        MR. KLINE:  All right.  I think that covers the
18 points I want to make, unless Your Honor has some further
19 questions.

20        THE COURT:  Okay.  Why isn't counsel right that, as
21 you said, the common issue here is coverage under the primary
22 policy and coverage was raised in state court so why isn't this
23 really an end run around the state court decision?

24        MR. KLINE:  There are different coverage issues.
25 This coverage issue is not reached by Justice Freedman.  At

1  pages 3 to 4 of the rule --

2           THE COURT:  But she said it was premature and this

3  shouldn't be happening now.

4           MR. KLINE:  She found that the litigation of the

5  application of the Arch exclusion was premature.  What Justice

6  Freedman did not reach was the question that is being presented

7  by the motion for preliminary injunction to be argued this

8  morning of whether or not under language of the primary policy

9  and applicable law an insurance company that has denied,

10 regardless of the basis, can't -- has to be obligated to advance

11 defense fees and costs notwithstanding the existence of that

12 coverage defense when the demand is made and has to instead

13 litigate issues of coverage all the way to a conclusion and

14 then try to recoup those amounts.

15          That limited question is the question on which

16 Arch seeks to intervene here, and that's the question that's

17 presented by the motion for preliminary judgment.  Regardless

18 of what the specific coverage defense is, the common issue is

19 whether or not given the language of the primary policy that

20 only requires the advancement of covered defense costs, the

21 Court should turn a blind eye to that language and enforce the

22 advancement of those defense fees and costs anyway until there's

23 some final adjudication in the coverage litigation.

24          THE COURT:  But I mean, you're using the same term,

25 "covered," "coverage."  It's the same term and it's the same

14

1 analysis, isn't it, that she went through?

2                MR. KLINE:  No, Your Honor.  The analysis --

3                THE COURT:  I mean, I understand that she had an

4 alternative basis for her ruling, so one of her bases -- we

5 went through this point on coverage.

6                MR. KLINE:  Your Honor, Justice Freedman did not

7 look at the advancement language in the policy.  In the Supreme

8 Court, the director defendants actually asked Justice Freedman

9 to enter an order for the advancement of defense fees and costs

10 until final adjudication of the coverage issue.  And in her

11 opinion she expressly did not reach that issue, so the specific

12 issue on which we seek to intervene in this matter were reached

13 by Justice Freedman.

14                THE COURT:  They're not asking for it here.

15                MR. KLINE:  They are, Your Honor, in their

16 preliminary injunction papers.

17                THE COURT:  Not from Arch.

18                MR. KLINE:  They are asking it from Axis and it

19 will be the same issue under the primary policy language

20 because both Arch and Axis incorporate by reference conditions

21 D-2 and D-3, which are at issue in this case.

22                Because of that overlap Arch has an interest in

23 the income.  I have no doubt that depending on the outcome here

24 one side or the other will be able to tout that, if and when

25 the Arch layer is ever reached.  And, given the burn rate on

15

1  defense expenses and the demands for settlement that are now
2  being bandied about, I have no doubt that the existence of
3  coverage under the Arch policy will be squarely at issue in the
4  very near future based on the communications that we're
5  receiving.  And at that point, we're going to have to deal with
6  this issue.  It's much more efficient to deal with the issue in
7  one proceeding when that same language is at issue on that
8  issue.
9            THE COURT:  Even though you have different
10 language in your own policy from --
11           MR. KLINE:  The exclusionary language differs.
12 That's correct, Your Honor.
13           THE COURT:  Okay.
14           MR. STANDISH:  Your Honor, I just want to
15 reiterate.  Their motion very clearly says they seek to
16 intervene to litigate the issue whether the Arch policy
17 requires Arch to advance defense costs.  They're not coming in
18 seeking to just talk about whether in general we can get
19 advancement or whether under the Axis policy we're entitled to
20 advancement and question whether they even have standing to do
21 that.
22           In that sense, they're like any insurer that may be
23 out there that may have language similar to the primary policy
24 in any case.  You wouldn't allow that insurer to come and
25 intervene in this case.  And here, they've already been told by

1  Justice Freedman they really can't do what they're now seeking
2  to do.  And if you look at their proposed brief, it's full of
3  references that their policy, their prior knowledge to
4  exclusion: they're seeking to argue the applicability of that
5  exclusion albeit to try to avoid advancement as against them,
6  which has not been sought.

7           THE COURT:  Okay.  Arch Insurance Company has
8  moved for permission to intervene under Rule 24(b) incorporated
9  by Bankruptcy Rule 7024 in this declaratory judgment litigation
10  between a lower tier insurer, Axis Reinsurance Company and
11  various defendants, former directors and officers of Refco,
12  Inc.  The movant acknowledges that there's not a complete
13  overlap of the issues in the Axis Reinsurance litigation and
14  the litigation that it would want to pursue if it were
15  permitted to intervene, which would be to seek a declaratory
16  judgment that it -- that is, Arch -- would not be obligated
17  under the Arch policy to advance defense costs to the directors
18  and officer beneficiaries of Refco's insurance with it.  That is
19  because exclusions relied upon by Arch in its policy differ
20  from exclusions relied upon by Axis.

21           The common issue that Arch relies upon for
22  purposes of Rule 24(b) is language in the first-tier policy
23  pertaining to covered claims as they relate to defense costs,
24  among others -- or "losses," as defined in the policy -- which
25  is a link in the logical chain that if broken might prevent

1   Arch from pursuing certain of its arguments, if not all of
2   them, that it does not have to advance coverage.  No
3   beneficiary of the policy has actually apparently at this time
4   sought to compel Arch to advance coverage.  I would also note
5   that the debtor in this case has appeared to be completely
6   neutral on the issue and is not a party to this litigation and
7   has taken no position whatsoever.

8           It appears to me that to the extent that it is a
9   common issue of law (and fact to the extent there's any factual
10  issue) in interpreting the relevant insurance policies, it
11  would not be a proper exercise of my discretion to permit Arch
12  to intervene.  As is clear from the briefing on the motions
13  before the Court today in connection with the Axis Reinsurance
14  matter, first, the actual language of the policy is important.
15  Second, issues of ripeness or whether the Axis litigation is
16  premature are important and are to some extent fact driven, in
17  particular driven by the claimed exigencies faced by the policy
18  beneficiaries, the officers and officers who have felt the
19  pinch of not getting the coverage at that tier.

20          To my mind, it would therefore be inefficient to
21  include Arch in this litigation at this time, and it would
22  instead be efficient to pursue the issues that are truly before
23  the Court in this litigation: that is, the issues involving
24  Axis and the directors and officers' claims against Axis and not
25  use this litigation as a funnel to invite any prospective

1 insurer to join some sort of massive proceeding.

2          That's compounded by two other considerations.
3 First, I note that Arch pursued in New York State court
4 declaratory judgment litigation regarding the terms of its own
5 policy and "coverage" under that policy, and the state court
6 ruled that that litigation was premature.  It seems to me, in
7 large extent this is an end run around that ruling -- that,
8 i.e., Arch's request to intervene here would be an end run
9 around that ruling -- and at a minimum that if I permitted Arch
10 to intervene, we would be frequently interrupted in litigation
11 by considerations of whether what Arch is in particular seeking
12 at that particular moment (if I permitted it to intervene)
13 would be an end run around that order or whether the order
14 would be binding on it.

15          Finally, as I noted at the pretrial conference on
16 this matter, I continue to have some concern, given (a) that
17 Refco's plan is confirmed and effective and substantially
18 consummated and (b) that Refco, the debtor, has no
19 participation in this litigation at all, as to the extent of my
20 jurisdiction over it.  And in light of all the other factors
21 that I've already mentioned arguing that I should not exercise
22 my discretion to further expand this adversary proceeding to
23 involve other insurers, it seems to me that Arch's issues, if
24 they're to be brought at all, should be brought in another court
25 when they become ripe.

1    So I'm not sure which of these counsel here took
2  the lead on this matter, but certainly you could submit an
3  order consistent with my ruling denying the motion.
4    I would ask you just to send a -- well, you can
5  work it out among yourselves.  I'd just ask one of you to send a
6  copy to Arch's counsel.  You don't have to settle it on him, but
7  just send him a copy at the same time you're sending it to
8  chambers, or as a courtesy you may want to send it to him a day
9  before, so he can determine that it's consistent with my ruling.
10
11    MR. KLINE:  Okay.  No problem.
12    THE COURT:  Okay.  Okay.  All right.  So that
13  leads to the motion to dismiss.
14    [Pause in the proceedings.]
15    MR. WALSH:  Michael Walsh from Weil, Gotshal &
16  Manges on behalf of all of what we call the director
17  defendants.  That's Brightman, Ganter, Harkins, Jeakel, Lee,
18  O'Kelly and Schoen.  It seems like Your Honor is very familiar
19  with the background here, but I can just run through the
20  structure if that would be helpful.
21    THE COURT:  Okay.
22    MR. WALSH:  Refco arranged the known insurance in
23  the amount of 70 million dollars.  That consists of a primary
24  policy and five excess policies.  Axis provides a third tier in
25  that tower, that is, the second excess policy and all of the

# Exhibit E

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

|  |  |
|---|---|
| ARCH INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>JOHN D. AGOGLIA, PHILLIP R. BENNETT, LEO R. BREITMAN, EDWIN L. COX, SUKHMEET DHILLON, THOMAS H. DITTMER, NATHAN GANTCHER, STEPHEN GRADY, TONE GRANT, THOMAS HACKL, DAVID V. HARKINS, SCOTT L. JAECKEL, DENNIS A. KLEJNA, THOMAS H. LEE, ERIC G. LIPOFF, SANTO C. MAGGIO, PETER MCCARTHY, JOSEPH MURPHY, FRANK MUTTERER, RICHARD N. OUTRIDGE, RONALD L. O'KELLEY, SCOTT A. SCHOEN, WILLIAM M. SEXTON, GERALD SHERER, PHILIP SILVERMAN and ROBERT C. TROSTEN,<br><br>Defendants. | Index No.: 08-600029<br><br>**FIRST AMENDED COMPLAINT**<br>**FOR DECLARATORY JUDGMENT** |

NEW YORK
COUNTY CLERK'S OFFICE
FEB 22 2008
NOT COMPARED
WITH COPY FILE

In support of its first amended complaint against defendants, plaintiff Arch Insurance Company ("Arch") alleges as follows:

## INTRODUCTION

1.   Arch issued an excess directors, officers and corporate liability insurance policy to Refco, Inc. ("Refco") for the period from August 11, 2005 to August 11, 2006 (the "Arch Policy"). Since August 11, 2005, numerous lawsuits and governmental and/or regulatory investigations (the "Underlying Matters") involving certain individuals insured under the Arch Policy have been instituted and various of those individuals have tendered the Underlying

Matters to Arch for coverage under the Arch Policy. Arch brings this action against the defendants named herein ("Defendants") to seek a declaration that the Arch Policy affords no coverage for the Defendants in connection with the Underlying Matters.

2. This is the second lawsuit that Arch has filed in this court for a declaration regarding the parties' rights and responsibilities under the Arch Policy. The first lawsuit (Index No. 600805/06) was dismissed without prejudice by Justice Freedman in an opinion dated February 20, 2007 based on two factors that no longer exist. First, the Arch Policy contains a limit of liability that is $10 million excess of $40 million in underlying limits, and Justice Freedman ruled that it was entirely speculative whether the Underlying Matters would ever generate losses that would implicate the Arch Policy. Since that ruling, the limits of the underlying policies have been depleted at a voracious pace. As of the filing of this first amended complaint, the underlying insurers have advanced approximately $27.5 million in attorneys' fees and costs, and the bevy of law firms representing the individual insureds is generating over $2 million per month in additional fees and costs. Thus, contrary to the position that the individual insureds advanced before this Court when Arch filed its first action, it is far from speculative whether, setting aside the dispositive coverage issues that Arch outlines in this complaint based on the unique terms of its Policy, the Arch limit will be implicated.

3. Justice Freedman also held that Arch could not proceed with the first action because the question whether any insured had knowledge of facts or circumstances that might give rise to a claim as of the Arch Policy inception date – key issue for purposes of the exclusions that form the basis for Arch's denial of coverage – would overlap with issues that were not yet adjudicated in the Underlying Matters. That impediment no longer exists. Beginning on December 19, 2007, three former executives of Refco – namely, its former Chairman, President and Chief

2

Executive Officer, Phillip R. Bennett, its former Chief Financial Officer, Robert C. Trosten, and its former Executive Vice President, Santo C. Maggio – pleaded guilty to a number of federal charges, including conspiracy, securities, wire and bank fraud, making false filings with the SEC, making false statements to Refco's auditors and money laundering. In connection with their guilty pleas, Bennett, Trosten and Maggio, all of whom are insureds under the Arch Policy, each admitted that he knew of and participated in the wrongdoing that is at the heart of the allegations in the Underlying Matters. These guilty pleas and related admissions of fact, which establish that Bennett, Trosten and Maggio knew of the wrongdoing at the time of the inception of the Arch Policy, trigger the applicability of the exclusions identified in this amended complaint as to all of the Defendants in this action with respect to the Underlying Matters without regard to the outcome of any unresolved proceeding involving any other Defendant. Thus, the second ground for the dismissal of Arch's first action no longer exists.

## JURISDICTION AND VENUE

4.   This Court has jurisdiction to resolve an actual controversy between Arch and the Defendants pursuant to the New York Declaratory Judgment Act, CPLR § 3001.

5.   Personal jurisdiction over Defendants is proper pursuant to CPLR § 301 and § 302. Defendants possess sufficient minimum contacts with the state of New York to render the exercise of jurisdiction by a New York court permissible under traditional notions of fair play and substantial justice. Defendants were directors or officers of Refco, a corporation with its principal place of business in New York.[1]  As directors and/or officers of Refco, Defendants

---

[1] "Refco", as used herein, refers to Refco, Inc., the publicly-traded company formed in connection with an August 2005 initial public offering, Refco Group Ltd., LLC ("RGL"), the company through which Refco, Inc.'s business primarily was conducted prior to the offering, and the subsidiaries of Refco, Inc. and Refco Group Ltd., LLC.

3

transacted business in the state of New York. In addition, some or all of Defendants seek coverage under the Arch Policy for the Underlying Matters. Accordingly, Defendants have an ongoing contractual relationship with Arch, a corporation with its principal place of business in New York. Finally, most of the lawsuits comprising the Underlying Matters were filed in the federal courts located in New York. These lawsuits allege that Defendants committed acts in the state of New York and/or acts outside the state of New York that could reasonably be expected to have consequences in the state of New York.

6.  Venue is proper in this County under CPLR § 503 because Arch has its principal place of business in this County.

## PARTIES

7.  Arch is an insurance company that is organized and exists pursuant to the laws of the state of Missouri. Arch has its principal place of business in New York County, New York.

8.  Defendant John D. Agoglia ("Agoglia") served as a senior vice president at Refco Securities, LLC, a subsidiary of Refco, Inc., at times relevant to this action. Upon information and belief, Agoglia is a citizen of New York.

9.  Defendant Phillip R. Bennett ("Bennett") served as the Chairman, President and Chief Executive Officer of Refco until October 2005, when he took a leave of absence at the request of the Refco board of directors. Upon information and belief, Bennett is a citizen of New Jersey.

10. Defendant Leo R. Breitman ("Breitman") served as a director of Refco at times relevant to this action. Upon information and belief, Breitman is a citizen of Florida.

11. Defendant Edwin L. Cox ("Cox") served as a director of Refco Group Ltd., LLC at times relevant to this action. Upon information and belief, Cox is a citizen of Texas.

4

12. Defendant Sukhmeet Dhillon ("Dhillon") served as Executive Vice President of Refco Group Ltd., LLC and as Executive Vice President of the entity that became Refco LLC, during times relevant to this complaint. Upon information and belief, Dhillon is a citizen of California.

13. Thomas H. Dittmer ("Dittmer") served as Chairman and CEO of Refco during times relevant to this action. Upon information and belief, Dittmer is a citizen of Illinois.

14. Defendant Nathan Gantcher ("Gantcher") served as a director of Refco at times relevant to this action. Upon information and belief, Gantcher is a citizen of New York.

15. Defendant Stephen Grady ("Grady") was COO of Refco Global Futures LLC, a Refco subsidiary, during times relevant to this action. Upon information and belief, Grady is a citizen of New Jersey.

16. Defendant Tone Grant ("Grant") served as President of Refco Group Ltd., LLC at times relevant to this action. Upon information and belief, Grant is a citizen of Illinois.

17. Defendant Thomas Hackl ("Hackl") served as Executive Vice President of RGL at times relevant to this action. Upon information and belief, Hackl is a citizen of Geneva, Switzerland.

18. Defendant David V. Harkins ("Harkins") served as a Director of Refco at times relevant to this action. Upon information and belief, Harkins is a citizen of Massachusetts.

19. Defendant Scott L. Jaeckel ("Jaeckel") served as a Director of Refco at times relevant to this action. Upon information and belief, Jaeckel is a citizen of Massachusetts.

20. Defendant Dennis A. Klejna ("Klejna") served as Executive Vice President and General Counsel of Refco Group Ltd., LLC at times relevant to this action. Upon information and belief, Klejna is a citizen of Washington, D.C.

5

21. Defendant Thomas H. Lee ("Lee") served as a Director of Refco at times relevant to this action. Upon information and belief, Lee is a citizen of New York.

22. Defendant Eric G. Lipoff ("Lipoff") served as Executive Vice President of a Refco subsidiary at times relevant to this action. Upon information and belief, Lipoff is a citizen of California.

23. Defendant Santo C. Maggio ("Maggio") served as an Executive Vice President of Refco and as President and Chief Executive Officer of Refco Securities, LLC and Refco Capital Markets, Ltd. at times relevant to this action. Upon information and belief, Maggio is a citizen of Florida.

24. Defendant Peter McCarthy ("McCarthy") served as Executive Vice-President of Refco Securities at times relevant to this action. Upon information and belief, McCarthy is a citizen of New Jersey.

25. Defendant Joseph Murphy ("Murphy") served as President of Refco from October 2005 to November 28, 2005, when he resigned. Murphy also served as Chief Executive Officer of Refco Global Futures and President of Refco, LLC at times relevant to this action. Upon information and belief, Murphy is a citizen of New Jersey.

26. Defendant Frank Mutterer ("Mutterer") served as Controller of Refco Group Ltd., LLC, during times relevant to this action. Upon information and belief, Mutterer is a citizen of New Jersey.

27. Defendant Richard N. Outridge ("Outridge") served as CFO of Refco Capital Management at times relevant to this action. Upon information and belief, Outridge is a citizen of Pennsylvania.

6

28. Defendant Ronald L. O'Kelley ("O'Kelley") served as a Director of Refco at times relevant to this action.  Upon information and belief, O'Kelley is a citizen of Florida.

29. Defendant Scott A. Schoen ("Schoen") served as a Director of Refco at times relevant to this action.  Upon information and belief, Schoen is a citizen of Massachusetts.

30. Defendant William M. Sexton ("Sexton") served as Executive Vice President and Chief Operating Officer of Refco at times relevant to this action.  Upon information and belief, Sexton is a citizen of Iowa.

31. Defendant Gerald Sherer ("Sherer") served as Executive Vice President and Chief Financial Officer of Refco at times relevant to this action.  Upon information and belief, Sherer is a citizen of New York.

32. Defendant Philip Silverman ("Silverman") served as Secretary of Refco at times relevant to this action.  Upon information and belief, Silverman is a citizen of New Jersey.

33. Robert C. Trosten ("Trosten") served as Executive Vice President and Chief Financial Officer of Refco Group Ltd., LLC at times relevant to this action.  Upon information and belief, Trosten is a citizen of New Jersey.

## FACTUAL ALLEGATIONS

### The Arch Policy

34. The Arch Policy is an excess directors, officers and corporate liability policy.  It has a policy period of August 11, 2005 to August 11, 2006 and a limit of liability of $10 million excess of $40 million in underlying insurance.  A copy of the Arch Policy is attached as Exhibit A.

35. Various other insurers issued underlying insurance policies to Refco.  U.S. Specialty Insurance Company issued a primary policy with limits of $10 million excess of applicable retentions (the "Primary Policy").  A copy of the Primary Policy is attached as Exhibit B.  Lexington Insurance Company issued a first excess policy with limits of $7.5 million excess of

7

$10 million (the "Lexington Policy"). A copy of the Lexington Policy is attached as Exhibit C.

Axis Reinsurance Company issued a second excess policy with limits of $10 million excess of

$17.5 million (the "Axis Policy"). A copy of the Axis Policy is attached as Exhibit D. Allied

World Assurance Company issued a third excess policy with limits of $12.5 million excess of

$27.5 million (the "AWAC Policy"). A copy of the AWAC Policy is attached as Exhibit E.

Each of the underlying policies has a policy period of August 11, 2005 to August 11, 2006.

36. In general, the Arch Policy applies in conformance with the terms and conditions of

the Primary Policy and in conformance with the terms and conditions in the Arch Policy or any

other underlying insurance "further limiting or restricting coverage." Arch Policy, Section I.C.

The Arch Policy provides that "[i]n no event shall this Policy grant broader coverage than that

provided by the most restrictive policy included in the Underlying Insurance." *Id.* The Arch

Policy provides that coverage thereunder applies only after exhaustion of the **Underlying Limit**

solely as a result of actual payment under the **Underlying Insurance** in connection with

**Claim(s).** *Id.*, Section I.B.[2]

37. Subject to all of its terms and conditions, the Arch Policy affords five types of

specified coverage. First, the Arch Policy affords specified coverage to **Insured Persons** for

"**Loss** arising from **Claims** first made during the **Policy Period** . . . for **Wrongful Acts**, except

when and to the extent that the **Company** has paid such **Loss** to or on behalf of the **Insured**

**Persons** as indemnification or advancement." Primary Policy, Insuring Agreement (A).

**Insured Persons** is defined in relevant part as "any past, present or future director or officer of

---

[2]  Policy language appearing herein in bold typeface is defined in the policy being quoted, and appears in bold typeface in that policy.

8

the **Company** . . . ." Primary Policy, Definition F(1). The **"Company"** is Refco Inc. and its

subsidiaries. Primary Policy, Definitions (C), (H), (O), Declarations Item 1.

38. Second, subject to all of its terms and conditions, the Arch Policy affords specified

coverage to the Company for "**Loss** arising from . . . **Claims** first made during the **Policy**

**Period** . . . against the **Insured Persons** for **Wrongful Acts**, if the **Company** has paid such **Loss**

to or on behalf of the **Insured Persons** as indemnification or advancement." Primary Policy,

Insuring Agreement (B)(1).

39. Third, subject to all of its terms and conditions, the Arch Policy affords specified

coverage to the Company for "**Loss** arising from **Securities Claims** first made during the **Policy**

**Period** . . . against the **Company** for **Wrongful Acts**." Primary Policy, Insuring Agreement

(B)(2).

40. Fourth, subject to all of its terms and conditions, the Arch Policy affords specified

coverage to the "**Controlling Shareholder**," defined as Bennett, for "**Loss** arising from a

**Securities Claim** first made during the **Policy Period** . . . against such **Controlling Shareholder**

for **Wrongful Acts**, provided, that one or more **Insured Persons** and/or the **Company** are and

remain co-defendants in such **Securities Claim** along with such **Controlling Shareholder**."

Primary Policy, Endorsement No. 15.

41. Fifth, subject to all of its terms and conditions, the Arch Policy affords specified

coverage to the Company for "all **Derivative Demand Investigation Costs** incurred by the

**Company** as a result of a **Derivative Demand** first received by the **Company's** Board of

Directors and reported in writing to the Insurer during the **Policy Period** . . . up to the amount of

the **Derivative Demand Investigation Costs Sub-Limit**" of $250,000. Primary Policy,

Endorsement No. 11.

42. The AWAC Policy contains the following provision: "It is hereby understood and agreed that the **Insurer** shall not be liable for **Loss** in connection with any claim or claims made against the **Insureds** alleging, arising out of, based upon, in consequence of, or attributable to facts or circumstances of which any Insured had knowledge as of inception and (i) which a reasonable person would suppose might afford valid grounds for a claim which would fall within the scope of the coverage hereunder; or (ii) which indicate the probability of any such claim." AWAC Policy, Endorsement No. 3 ("AWAC Prior Knowledge Exclusion").

43. The Arch Policy contains the following provision: "If any **Insured** as of August 11, 2005 has any knowledge of or information concerning any act, error, omission, fact, matter or circumstance that might give rise to a **Claim** under this Policy, the **Excess Insurer** shall not be liable to make any payment under this Policy as a result of a **Claim** arising out of, based upon or attributable to any such act, error, omission, fact, matter or circumstance." Arch Policy, Endorsement No. 4 (the "Arch Prior Knowledge or Information Exclusion").

44. The Arch Policy defines **Insured(s)** as "any person(s) or entity(ies) that are entitled to coverage under the **Followed Policy** at its inception." Arch Policy, § III.B. The "**Followed Policy**" is the Primary Policy. Arch Policy, § III.C.; Declarations, Item 4.

45. The Arch Policy and underlying insurance policies contain other terms, conditions and limitations that may ultimately be implicated in this action.

46. Defense Costs have been advanced to certain Defendants under the Primary Policy, the Lexington Policy and the Axis Policy.[3] As of the filing of this first amended complaint, the

---

[3] The coverage defenses that Arch advances in this action are unique to the Arch Policy; thus, the fact that U.S. Specialty and Lexington advanced fees and costs has no bearing on the coverage issues presented in this case. Axis was ordered by the Refco bankruptcy court to advance fees and costs despite its denial of coverage based on its unique policy provisions and

advancement of defense costs has exhausted the $10 million limit of the Primary Policy, the $7.5 million limit of the Lexington Policy, and the $10 million limit of the Axis Policy. The law firms representing the defendants in the Underlying Matters are currently generating attorneys' fees and costs in the vicinity of $2 million *per month*. Thus, it is far from conjectural that the Arch Policy limits will be implicated unless this Court promptly adjudicates the coverage issues presented in this case.

### The Events at Refco

47. The Arch Policy incepted on August 11, 2005. On the same day, Refco conducted its initial public offering.

48. On October 10, 2005, Refco issued a press release. The press release announced that the Company had been carrying an undisclosed receivable of $430 million from an entity controlled by Bennett. Refco stated that "[b]ased on the results of the review to date, the Company believes that the receivable was the result of the assumption by an entity controlled by Mr. Bennett of certain historical obligations owed by unrelated third parties to the Company, which may have been uncollectible." Moreover, Refco stated that although the receivable "was reflected on the Company's prior period financials, as well as on the Company's May 31, 2005 balance sheet," the receivable "was not shown as a related party transaction in any such financials. For that reason, and after consultation by the Audit Committee with the Company's independent accountants, the Company determined, on October 9, 2005, that its financial statements, as of, and for the periods ended, February 28, 2002, February 28, 2003, February 28,

---

contrary to the language in the operative policies. Axis has appealed that order to the United States District Court for the Southern District of New York.

2004, February 28, 2005, and May 31, 2005, taken as a whole, for each of Refco Inc., Refco Group Ltd., LLC and Refco Finance, Inc. should no longer be relied upon."

49. On October 11, 2005, Refco issued a second press release. The press release announced that Bennett had repaid the $430 million receivable in full. The press release also provided further information on the nature of the receivable: "Based on the results of the internal investigation to date, the Company believes that the receivable consisted in major part of uncollectible historical obligations owed by unrelated third parties to the Company, that arose as far back as at least 1998. These obligations were transferred periodically to the entity controlled by Mr. Bennett, and the Company's books and records then reflected a receivable from that entity, rather than a receivable from the originating accounts. The fact that the receivable was from a company controlled by Mr. Bennett was hidden at the end of quarterly and annual reporting periods by reason of transfers to a third party customer account that we currently believe is unaffiliated with Mr. Bennett or anyone else at the Company."

50. On October 17, 2005, Refco and certain of its unregulated subsidiaries filed for Chapter 11 bankruptcy protection.

51. On January 16, 2007, a federal grand jury returned a third superseding indictment against Bennett, Trosten and Grant (the "S3 Indictment"). The S3 Indictment charged Bennett, Trosten and Grant with securities fraud, conspiracy to commit securities fraud, wire fraud, bank fraud and money laundering. The S3 Indictment also charged Bennett with making false filings with the SEC and making false statements to Refco's auditors. A copy of the S3 Indictment is attached hereto as Exhibit F.

52. On February 15, 2008, Bennett, who is an **Insured** under the Arch Policy, pleaded guilty to all charges against him in the S3 Indictment. Five days later, on February 20, 2008,

12

Trosten, who also is an **Insured** under the Arch Policy, similarly pleaded guilty to charges of

conspiracy, securities, wire and bank fraud and money laundering.

53. The S3 Indictment charged that, beginning in the mid 1990's, Bennett, Trosten and

their co-conspirators engaged in a scheme to mask the true financial performance of Refco.

Specifically,

> [s]tarting at least as early as the mid 1990s, BENNETT and
> GRANT schemed to hide the true financial health of Refco from
> its banks, counterparties, auditors, and investors. Starting at least
> as early as the late 1990s, BENNETT and GRANT embarked on a
> strategy to mask the true performance of Refco's business in order
> to sell the company for their own benefit and that of Refco's other
> owners. To that end, over the ensuing years, BENNETT,
> TROSTEN, GRANT and others known and unknown
> systematically (1) covered up both Refco's own losses and
> customer losses for which Refco became responsible; (2) moved
> Refco operating expenses off the company's books; and (3) padded
> Refco's revenues, all in an effort to mislead Refco's banks,
> counterparties, auditors and investors, with the goals of keeping
> Refco in business and then selling it for the maximum benefit to its
> owners and senior management.

S3 Indictment, ¶ 7.

54. According to the S3 Indictment, in furtherance of the scheme, Bennett, Trosten and

their co-conspirators made and caused Refco and others on its behalf to make false and

fraudulent statements to Refco's banks, counterparties, customers, auditors and investors, and to

create false audited financial statements and false public filings with the SEC.

55. The S3 Indictment charged that the scheme permitted Refco to engage in, among

other things, Refco's August 2005 initial public offering of stock, in which the public purchased

approximately $583 million of Refco common stock based on a false and fraudulent registration

statement.  S3 Indictment, ¶ 8.

56. According to the S3 Indictment, the scheme was hatched in 1997, when Refco

directly and indirectly incurred a series of substantial trading losses that threatened the continued

viability of its business. S3 Indictment, ¶ 9. In response to those losses, Bennett, Trosten and others moved losses and expenses out of Refco and into Refco Group Holdings, Inc. ("RGHI"), an entity that owned Refco and that was owned by, among others, Bennett and Grant, in an effort to mask Refco's financial condition. This strategy increased the debt owed by RGHI to Refco (the "RGHI Receivable"), which ultimately grew to over $1 billion. *Id.*

57. The S3 Indictment charged that, beginning as early as February 1998, Bennett and others directed a series of transactions every year designed to hide the "huge and growing" RGHI Receivable from, among others, Refco's auditors, by temporarily paying down all or part of the RGHI Receivable over Refco's fiscal year-end and replacing it with a receivable from one or more other entities not related to Bennett or Refco. S3 Indictment at ¶ 21. Bennett and others caused this cover-up to occur "at every fiscal year-end from at least the fiscal year-end on February 28, 1998 through the fiscal year-end on February 29, 2004." *Id.* Beginning in 2004, Bennett and others began causing these cover-up transactions to occur at the ends of Refco's quarterly reporting periods. *Id.* at ¶ 46.

58. The S3 Indictment further charged that Bennett, Trosten and others participated in a scheme to defraud participants in the 2004 leveraged buyout of Refco, which was led by private equity fund Thomas H. Lee Partners, by misleading the fund and purchasers of the $600 million in notes and $800 million in bank debt about the true financial health of Refco. S3 Indictment, ¶ 34.

59. Based on these and other allegations, the S3 Indictment charged Bennett as follows:



| Count | Charge |
|-------|--------|
| 1 | Conspiracy to commit securities fraud, wire fraud, to make false filings with the SEC, to make material misstatements to auditors, bank fraud and money laundering |

| Count | Charge |
|-------|--------|
| 2 | Securities fraud in connection with the sale of 9% Senior Subordinated Notes due 2012 |
| 3 | Securities fraud in connection with the purchase and sale of Refco common stock |
| 4 | False filing with the SEC in connection with the filing of Refco's Form 10-K under the Exchange of 1934 on July 19, 2005 |
| 5, 6 | False filing with the SEC in connection with the filing of certain registration statements under the Securities Act of 1933 on April 6, 2005 and August 8, 2005 |
| 7 – 13 | Wire fraud in connection with certain electronic communications between June 22, 2004 and August 5, 2005, including the transmission of Refco's Form 10-K on July 19, 2005 and its registration statements on April 6, 2005 and August 8, 2005 |
| 14 | Material misstatements to auditors |
| 15 | Bank fraud in connection with the 2004 leverage buyout transaction |
| 16 – 20 | Money laundering in connection with proceeds of the 2004 leverage buyout transaction |

60. On February 15, 2008, Bennett pleaded guilty to all twenty counts against him in the

S3 Indictment. A copy of the transcript of the hearing ("2/15 Tr.") is attached hereto as Exhibit

G. During the hearing at which Bennett pleaded guilty, the following exchange occurred

between the Court and Bennett:

> THE COURT: Mr. Bennett, did you commit the crimes for which you've been charged?
>
> THE DEFENDANT: I did, your honor.
>
> THE COURT: Would you tell me in your own words what you did?

15

THE DEFENDANT: Your Honor, during the period that I served as CEO of Refco, I agreed with other Refco executives to enter into a series of transactions at the end of Refco's financial reporting periods to make it appear as if a receivable due to Refco from Refco Upholdings, Inc. [sic], a related party, was instead due from an independent third-party customer.

The IGHI [sic] receivable was composed of, amongst other things, historical customer losses, bad debts, and expenses that IGHI [sic] had incurred on behalf of Refco.

I, along with other Refco executives, have caused Refco to enter into these transactions in order to conceal the size and nature of the IGHI [sic] receivable. We concealed the receivable from, amongst others, Refco's auditors, Thomas H. Lee Partners, various lenders who, in 2004, participated in Refco's senior secured credit facility, and the issuance of 9 percent senior subordinated notes, and also investors in Refco's common stock.

Among the lenders to whom I knowingly caused the IGHI [sic] receivable to be misrepresented was HSBC Bank, referenced in Count Fifteen of the indictment. I and other Refco executives also used the interstate wires to accomplish these acts within this district, as referenced in Counts Seven through Thirteen. Furthermore, I caused funds obtained from the transaction with Thomas H. Lee Partners, referenced in paragraph 34 of the indictment, to be wired to various parties receiving proceeds from the transaction, as referenced in Counts Sixteen through Twenty, knowing that this money had been unlawfully obtained.

The IGHI [sic] receivable and related party transaction used to conceal it were material information that Refco investors and lenders would have wanted to have known prior to investing in or lending money to Refco. While I believed that I would be able to pay the IGHI [sic] receivable down over time, and did, in fact, ultimately pay [sic] off the receivable balance in its entirety, I knew that obtaining funds from Refco's investors and lenders based on misleading financial statements was also wrong.

I also caused Refco to file documents with the SEC, namely S1, S4, and 10-K that did not disclose the full extent of the IGHI [sic] receivable or the transactions used to conceal it; and, thus, were false and misleading with respect to material facts. I knew that failing to disclose these facts in public filings and in connection with Refco's sale and registration of Refco's notes and common stock was wrong , and I deeply regret having done so.

16

Your Honor, I take full responsibility for my actions . . . .

2/15 Tr. at 16-20.

61. At the conclusion of the February 15, 2008 hearing, the Court found that Bennett

pleaded guilty knowingly and voluntarily:

> THE COURT: Mr. Bennett, I'm satisfied that you understand the
> nature of the charges against you and the consequences of your
> plea; and that your plea is made voluntarily and knowingly; and
> that there is a sufficient factual basis for it. Accordingly, I will
> accept your plea of guilty . . . .

2/15 Tr. at 20.

62. The S3 Indictment charged Trosten as follows:

| Count | Charge |
|---|---|
| 1 | Conspiracy to commit securities fraud, wire fraud, to make false filings with the SEC, to make material misstatements to auditors, bank fraud and money laundering |
| 2 | Securities fraud in connection with the sale of 9% Senior Subordinated Notes due 2012 |
| 7, 8 | Wire fraud in connection with certain electronic communications between June 22, 2004 and August 3, 2004 5, 2005, including e-mails to representatives of Thomas H. Lee Partners |
| 15 | Bank fraud in connection with the 2004 leverage buyout transaction |
| 17-18 | Money laundering in connection with proceeds of the 2004 leverage buyout transaction |

63. On February 20, 2008, Trosten pleaded guilty to Counts 1, 2, 7, 15 and 17 against

him in the S3 Indictment. A copy of the transcript of the hearing ("2/20 Tr.") is attached hereto

as Exhibit H. During the hearing at which Trosten pleaded guilty, the following exchange

occurred between the Court and Trosten:

17

THE COURT: Mr. Trosten, did you commit the offenses that you are pleading guilty to?

THE DEFENDANT: I did, your honor.

THE COURT: Would you tell me, please, what you did?

\*      \*      \*

THE DEFENDANT: Your Honor, while I was employed at Refco, I agreed with other Refco executives to hide the true nature of Refco's finances on Refco's financial statements. I knew that Refco's financial statements did not accurately reflect Refco's financial condition, because the financial statements did not disclose the full amount that Refco Group Holdings, Inc., a related party, owed to Refco. I understood that the RGHI receivable was underreported because Phillip Bennett, Refco's former chief executive officer, and other Refco executives, including me, were involved in a series of transaction at the end of Refco's financial reporting periods to make it appear as if a receivable was due from third-party customers rather than from a related party.

The RGHI receivable was composed of, amongst other things, historic customer losses, bad debts, and expenses that RGHI incurred on behalf of Refco.

In addition, I participated in a number of transactions that padded or inflated Refco's income. For example, I participated in transactions that shifted expenses off the books of Refco and onto the books of Refco Group Holdings, Inc.

I, along with other Refco executives, agreed to conceal the true size and nature of the RGHI receivable from, amongst others, Refco's auditors, Thomas H. Lee Partners; HSBC, which, in 2004, participated in Refco's senior secured credit facility, as referenced in . . . paragraph 41 and Count Fifteen of the indictment; and investors who purchased bonds that Refco issued in 2004, as referenced in Count Two of the indictment.

I left the company in August 2004, one year before the IPO of Refco. I and other executives used the interstate wires to accomplish these acts within this district, as referenced in Count Seven of the indictment.

Furthermore, I received funds obtained from the transaction with Thomas H. Lee Partners, referenced in paragraph 34 of the indictment, which I knew were proceeds from unlawful activity, as referenced in Count Seventeen.

18

> The RGHI receivable and transactions used to conceal it were material information that Refco investors and lenders would have wanted to know before investing in or lending money to Refco.
>
> I knew that obtaining funds from Refco investors and lenders based on misleading financial information was wrong . . . .
>
> Your Honor, I take full responsibility for my actions and my conduct . . . .

2/20 Tr. at 17-20.

64. At the conclusion of the February 20, 2008 hearing, the Court found that Trosten pleaded guilty knowingly and voluntarily:

> THE COURT: Mr. Trosten, I am satisfied that you understand the nature of the charges against you and the consequences of your plea, and that your plea is made voluntarily and knowingly, and that there is a factual basis for your. I will, therefore, accept your plea of guilty.

2/20 Tr. at 20.

65. Meanwhile, on December 19, 2007, Maggio, who is an **Insured** under the Arch Policy, pleaded guilty to a four-count criminal information (the "Maggio Information") charging him with conspiracy, securities fraud and wire fraud. A copy of the Maggio Information is attached hereto as Exhibit I.

66. The Maggio Information, which included nearly all of the same charges of misconduct as the S3Indictment, charged that Maggio was one of Bennett's and Trosten's co-conspirators and that he participated in the conduct underlying the conspiracy. In particular, the Maggio Information charged that Maggio participated in the scheme to hide the RGHI Receivable and to mask the true financial condition of Refco in the several years prior to the August 11, 2005 initial public offering.

67. Based on these and other allegations, the Maggio Information charged Maggio as follows:

19

| Count | Charge |
|-------|--------|
| 1 | Conspiracy to commit securities fraud, wire fraud, to make false filings with the SEC, to make material misstatements to auditors, bank fraud and money laundering |
| 2 | Securities fraud in connection with the sale of 9% Senior Subordinated Notes due 2012 |
| 3 | Securities fraud in connection with the purchase and sale of Refco common stock |
| 4 | Wire fraud in connection with the electronic transmission of Refco's Form 10-K on July 19, 2005 |

68. On December 19, 2007, Maggio pleaded guilty to every count in the Maggio

Information. A copy of the transcript of the hearing ("12/19 Tr.") is attached hereto as Exhibit J.

During the hearing at which Maggio pleaded guilty, the following exchange occurred between

the Court and Maggio:

> THE COURT: Did you commit the offenses for which you have been charged, Mr. Maggio?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Tell me what you did.
>
>             *      *      *
>
> THE DEFENDANT: Your Honor, from the late 1990s to October 2005 I was a senior executive at Revko [sic] Ink [sic]. During that period I participated with others to hide the true financial health of Revko [sic] from banks, counter-parties, auditors and investors. With my knowledge and active participation Revko's [sic] substantial losses were covered up as revenues padded [sic] and certain operating expenses were moved off its book. Among the acts I personally engaged in [sic] the signing of loan agreements referencing paragraphs 61-D [loan agreement signed in furtherance of the conspiracy on or about February 20, 2004] and 61-P [loan agreement signed in furtherance of the conspiracy on or about February 23, 2005] of the indictment.
>
> As a result of my conduct and that of my coconspirators false financial statements were issued to obtain debt financing

> from the public including 9 percent senior subordinated notes referenced in Count Two of the indictment.
>
> To consummate the sale of 57 percent of Revko [sic] to a group headed by Thomas H. Lee in 2004 and to obtain $800 million in bank financing the same year and to effect the Revko [sic] initial public offering in 2005. [sic] Moreover, with my knowledge false financial statements were filed with the SEC including form 10K referencing Count Four. The mails and interstate wires were used as part of the fraudulent scheme.
>
> I deeply regret my conduct and the harm that it has caused.
>
> THE COURT: First of all, with respect to all of the activities that you've indicate you participated in it knowingly?
>
> THE DEFENDANT: Yes.

12/19 Tr. at 17-18.

69. At the conclusion of the December 19, 2007 hearing, the Court found that Maggio pleaded guilty knowingly and voluntarily:

> Based on defendant's allocution and the recommendations by the government I find that the defendant understands the nature, the charges and consequences of his guilty plea. I also find that the plea is voluntary and that there is a factual basis for the plea. I, therefore, recommend that the plea be accepted . . . .

12/19 Tr. at 20.

70. As demonstrated by each of their guilty pleas to counts that alleged their knowledge of, *inter alia,* efforts to hide the RGHI Receivable from the investing public prior to 2005, Bennett, Trosten and Maggio, as of August 11, 2005, had knowledge of or information concerning acts, errors, omissions, facts, matters or circumstances that might give rise to a Claim under the AWAC Policy or the Arch Policy.

## The Underlying Matters

71. Beginning on October 12, 2005, various lawsuits were filed against the Defendants.

21

72. A criminal complaint was filed against Bennett (the "Bennett Criminal Complaint") on October 12, 2005 in *United States v. Bennett*, No. 05-1720 (S.D.N.Y.).

73. The Bennett Criminal Complaint alleged that Bennett knowingly "hid from investors in [Refco's] August 2005 initial public offering of stock . . . the existence of hundreds of millions of dollars of related party transactions between Refco and a company controlled by Bennett, including causing Refco to file a false and fraudulent S-1 registration statement with the Securities and Exchange Commission." Bennett Criminal Complaint, ¶ 9. A federal grand jury in New York subsequently returned a criminal "Indictment" against Bennett that was filed on or about November 10, 2005 in *United States v. Bennett, et al.*, No. 05-1192 (S.D.N.Y.). This indictment repeated and expanded upon the allegations in the Bennett Criminal Complaint. On or about October 24, 2006, the grand jury returned a "Superseding Indictment" that named both Bennett and Trosten, and a "Second Superseding Indictment" against them on or about November 16, 2006. On January 16, 2007, a "Third Superseding Indictment" – referred to above as the "Bennett Indictment" – that added Grant as a defendant was filed. On December 19, 2007, the Information against Maggio was filed. Each of these filings alleged, among other things, that the defendant(s) named therein engaged in a scheme to hide the RGHI receivable from the investing public. Collectively, the proceedings initiated by these filings will be referred to herein as the "Criminal Proceedings".

74. The Bennett Criminal Complaint was tendered to Arch for coverage under the Arch Policy on or about October 13, 2005, and the Indictment, the Superseding Indictment, the Second Superseding Indictment and/or the Third Superseding Indictment were tendered to Arch for coverage under the Arch Policy thereafter.

22

75. The suits *Mazur et al. v. Refco, Inc., et al.*, No. 05-8626 (S.D.N.Y.), *Frontpoint Fin.*

*Serv., Inc. v. Refco, Inc., et al.*, No. 05-8663 (S.D.N.Y.), *Lieber v. Refco, Inc., et al.*, No. 05-8667

(S.D.N.Y.), *Weiss v. Refco, Inc., et al.*, No. 05-8691 (S.D.N.Y.), *Glaubach v. Refco, Inc., et al.*,

No. 05-8692 (S.D.N.Y.), *Gross v. Refco, Inc., et al.*, No. 05-8697 (S.D.N.Y.), *Salamone v. Refco,*

*Inc. et al.*, No. 05-8716 (S.D.N.Y.), *RD Partners LLC v. Refco, Inc., et al.*, No. 05-8737

(S.D.N.Y.), *Wakefield v. Refco, Inc., et al.*, No. 05-8742 (S.D.N.Y.), *Gaugler v. Bennett, et al.*,

No. 05-8886 (S.D.N.Y.), *Baker v. Bennett, et al.*, No. 05-8923 (S.D.N.Y.), *Nathanson v. Bennett,*

*et al.*, No. 05-8926 (S.D.N.Y.), *Becker v. Refco, Inc., et al.*, No. 05-8929 (S.D.N.Y.), *Mettupatti*

*v. Bennett, et al.*, No. 05-9048 (S.D.N.Y.), *Weiss v. Bennett, et al.*, No. 05-9126 (S.D.N.Y.), *Weit*

*v. Bennett, et al.*, No. 05-9611 (S.D.N.Y.), *Esses v. Bennett, et al.*, No. 05-9654 (S.D.N.Y.), *City*

*of Pontiac General Employees Retirement System v. Bennett et al.*, No. 05-9941 (S.D.N.Y.),

*Gensheimer v. Bennett*, No. 05-10318 (S.D.N.Y) and *Teachers' Retirement System of the State of*

*Illinois et al. v. Lee, et al.*, No. 05-10403 (S.D.N.Y.) are purported class action securities fraud

lawsuits that have been consolidated for pre-trial purposes under Case No. 05-8626 (the

"Securities Litigation"). The First Amended Consolidated Class Action Complaint ("FAC") was

filed in the consolidated proceedings on May 5, 2006, and the Second Amended Consolidated

Class Action Complaint was filed on or about December 3, 2007.

76. The FAC and SAC allege that Refco's initial public offering registration statement

and prospectus were materially false and misleading. Specifically, they allege that the

registration statement and prospectus failed to disclose the existence of the RGHI Receivable.

The FAC further alleges that the Refco financial statements incorporated in Refco's registration

statement and prospectus were inaccurate because they failed to disclose the related-party

transactions between Refco and RGHI designed to hide the RGHI Receivable. Included among

23

the defendants named in the SAC are Bennett, Sherer, Sexton, Maggio, Murphy, Silverman, Klejna, Trosten, Grant, O'Kelley, Breitman, Gantcher, Lee, Harkins, Jaeckel, and Schoen.

77. Beginning on or about October 14, 2005, some of the lawsuits comprising the Securities Litigation were tendered to Arch for coverage under the Arch Policy. The FAC was tendered to Arch by letter dated April 28, 2006.

78. The suits *David Fine v. Bennett, et al.*, No. 05-8701 (S.D.N.Y), and *Mehta v. Bennett, et al.*, No. 05-8748 (S.D.N.Y.), which were shareholder derivative actions (the "Derivative Litigation"), have been dismissed. Bennett, Sherer, Breitman, Gantcher, Harkins, Jaeckel, Lee, O'Kelley, Schoen, Sexton and Murphy, among others, were named as defendants in the Derivative Litigation.

79. The complaints in the Derivative Litigation alleged that Refco's initial public offering registration statement and prospectus were materially false and misleading. Specifically, the complaints alleged that the registration statement and prospectus failed to disclose the existence of the RGHI Receivable. The complaints further alleged that the Refco financial statements incorporated in its registration statement and prospectus were inaccurate because they failed to disclose the related-party transactions between Refco and RGHI that were designed to hide the RGHI Receivable.

80. The *Mehta* complaint was tendered to Arch for coverage under the Arch Policy on or about October 17, 2005.

81. The suit *Bawag P.S.K. Bank v. Refco Inc., et al.*, No. 05-60006 (S.D.N.Y. Bankr.), Adv. No. 05-03161, was filed on November 16, 2005 (the "Bawag Action"). The Bawag Action names Bennett (among others) as a defendant.

24

82. The complaint in the Bawag Action alleges that the plaintiff was fraudulently induced to loan approximately $420 million to Bennett on October 10, 2005. The complaint alleges that Bennett failed to disclose that he sought the loan to pay off the RGHI Receivable, a "related-party receivable resulting from the assumption by an entity controlled by Mr. Bennett of certain historical obligations owed by unrelated third parties to Refco [that] likely was impaired and not collectible." Bawag Action Complaint, § 17. The complaint alleges that Bennett "knew that if BAWAG had been aware of any of the key facts set forth in [Refco's] October 10, 2005 Press Release, BAWAG would not have made the Loan." *Id.*, § 30.

83. The Bawag Action was tendered to Arch for coverage under the Arch Policy on or about November 30, 2005.

84. The suit *Thomas H. Lee Equity Fund V, L.P., et al. v. Bennett, et al.*, No. 05-9608 (S.D.N.Y.), was filed on November 14, 2005 (the "THL Funds Action"). The THL Funds Action names Bennett, Grant and Maggio, among others, as defendants.

85. The complaint in the THL Funds Action alleges that in June 2004, the plaintiffs invested approximately $507 million in Refco. The complaint alleges that despite the plaintiffs' due diligence efforts, they were unaware that "Bennett intentionally and deliberately engaged in accounting fraud in order to mask a group of largely worthless receivables, bad debts and questionable obligations that, if accurately portrayed on the Company's financial statements, would have materially reduced Refco's value." THL Funds Action Complaint, § 4. Specifically, the complaint alleges that Bennett "nowhere disclosed to the THL Funds that what appeared to be a good and valid receivable from a third-party customer was actually a receivable from RGHI, an entity controlled by Bennett, representing hundreds of million dollars [sic] of customer losses and obligations that would never be repaid to the Company." *Id.*, § 30. The complaint alleges

25

that the Refco financial statements provided to the plaintiffs during their due diligence review in 2003 and 2004 were materially false and misleading.

86. The THL Funds Action was tendered to Arch for coverage under the Arch Policy on or about February 13, 2006.

87. The complaint in *Unovalores Ltd. v. Bennett,* No. L1564-05 (Sup. Ct. of New Jersey, Somerset County, Law Division) (the "Unovalores Action") was filed in New Jersey state court on or about November 1, 2005.

88. The plaintiff in the Unovalores Action, which identifies itself as a Refco Capital account holder, names only Mr. Bennett as a defendant. Plaintiff alleges that it entered into a Repurchase Transaction with Refco on August 31, 2005, in reliance upon representations in Refco's registration statement and other filings concerning Refco's financial health. Those representations were false, according to the complaint, because they concealed massive receivables owed by an entity controlled by Mr. Bennett and at least one-half billion dollars of related party transactions with Mr. Bennett.

89. The Unovalores Action was tendered to Arch for coverage under the Arch Policy on or about February 13, 2006.

90. The complaint in *American Financial International Group v. Refco, Inc., et al.,* No. 05-8988 (S.D.N.Y.) (the "American Financial Action"), was filed in the Southern District of New York on or about October 21, 2005, an amended complaint was filed on April 13, 2006, and a second amended complaint was filed on June 30, 2006.

91. The plaintiff in the American Financial Action identifies itself as a Delaware LLC that traded currencies through an account at Refco F/X Associates, LLC ("RefcoFX"). The suit is a purported class action brought on behalf of all persons who traded currencies through, or had

26

currency trading accounts with, RefcoFX from August 11, 2005 through the date the amended complaint was filed and who have been damaged. Included among the defendants named in the second amended complaint are Bennett, Sherer, Sexton, Maggio, Trosten, Mutterer and Silverman. The second amended complaint generally alleges the same conduct that is the subject of the Criminal Proceedings and the Securities Litigation.

92. The complaint in the American Financial Action was tendered to Arch for coverage under the Arch Policy on or about October 25, 2005, and the amended complaint was tendered to Arch in May 2006.

93. The complaint in *Global Management Worldwide Limited v. Philip R. Bennett, et al.*, No. 06-0643 (S.D.N.Y.) (the "Global Management Litigation"), was filed in the Southern District of New York on or about January 26, 2006, and a Consolidated Amended Class Action Complaint was filed in September 2006.

94. The plaintiff in the Global Management Litigation identifies itself as a corporation organized under the laws of Nassau, the Bahamas, that was a brokerage customer of Refco Capital Markets, Ltd. ("RCM"). The suit is a purported class action brought on behalf of all brokerage customers of RCM who, at any time from October 17, 2000 to October 17, 2005, entrusted securities to RCM and/or Refco Securities, LLC, directly or indirectly, as custodian and broker for safe-keeping, and continued to hold positions with RCM on October 17, 2005 or thereafter. Plaintiffs generally allege that, during the purported class period, Refco, either directly or through its affiliates, incurred billions of dollars in losses, and tried to hide those losses by surreptitiously selling securities held by RCM in custody for class members. Plaintiffs allege that the financial statements filed by Refco with the SEC during the purported class period were false and misleading because they fraudulently omitted these losses, as well as the scheme

27

to hide the losses by selling securities stolen from plaintiffs and by building up and hiding the RGHI Receivable. Plaintiffs further allege that they relied upon these false and misleading financial statements and the purported financial integrity of Refco in entrusting securities to RCM.

95. The Global Management Litigation was tendered to Arch for coverage under the Arch Policy on or about March 14, 2006.

96. On or about October 9, 2007, two separate lawsuits were brought by seven investment entities that maintained accounts at RCM: (1) *VR Global Partners L.P., et al. v. Bennett, et al.,* Case No. 07-8686 (S.D.N.Y.) and (2) *Capital Management Select Fund Ltd., et al., v. Bennett, et al.,* Case No. 07-8688 (S.D.N.Y.). The complaints, which were tendered to Arch in October 2007, also allege that Refco insiders schemed to hide the RGHI Receivable, thereby inducing plaintiffs to maintain accounts at RCM, and converted securities owned by plaintiffs to hide losses incurred by Refco. The defendants in the *VR Global* and *Capital Management* litigations include Bennett, Sexton, Maggio, Murphy, Silverman, Trosten, Grant, Lee, Harkins, Jaeckel, Schoen and Outridge. By order dated November 20, 2007, the Global Management Litigation was consolidated for pre-trial purposes with the *VR Global* and *Capital Management* litigations. The consolidated proceedings will be referred to herein as the "RCM Brokerage Customer Securities Litigation."

97. The complaint in *Kirschner v. Thomas H. Lee Partners, L.P.,* No. 07-7074 (S.D.N.Y) (the "Trustee/THL Partners Litigation"), was filed in the Southern District of New York on or about August 8, 2007.

98. The plaintiff in the Trustee/THL Partners Litigation identifies himself as the trustee of the Refco Litigation Trust ("Trustee"). The individual defendants named in the complaint are

28

Lee, Harkins, Jaeckel, and Schoen. The Trustee generally alleges that the individual defendants breached fiduciary duties owed to Refco by failing to inform themselves of Refco's true financial state – including efforts to hide the RGHI Receivable – before making business decisions on behalf of Refco.

99. The complaint in the Trustee/THL Partners Litigation was tendered to Arch for coverage under the Arch Policy by letter dated August 16, 2007.

100.     The complaint in *Kirschner v. Grant Thornton LLP, et al.*, No. 2007L008818 (Cook County, Ill.) (the "Grant Thornton Litigation"), was filed in Illinois state court on August 21, 2007, and was removed to federal court on or about September 19, 2007 as Case No. 07-cv-05306 (N.D. Ill.).

101.     The Grant Thornton Litigation was brought by the Trustee. The individual defendants named in the complaint include Bennett, Maggio, Trosten, and Grant. The Trustee generally alleges that these defendants engaged in a scheme to hide Refco's true financial condition, which included efforts to hide the RGHI Receivable.

102.     The complaint in the Grant Thornton Litigation was tendered to Arch for coverage under the Arch Policy by letter dated September 20, 2007.

103.     The complaint in *Kirschner v. Agoglia, et al.*, Adv. Pro. No. 07-3060 (Bankr. S.D.N.Y.) (the "Agoglia Litigation"), was filed on or about October 15, 2007.

104.     The Agoglia Litigation was brought by the Trustee. The individual defendants named in the complaint are Agoglia, Bennett, Cox, Dittmer, Dhillon, Grady, Grant, Lipoff, Maggio, McCarthy, Murphy, Mutterer, Sexton, and Trosten. The Trustee alleges that Bennett and others "orchestrated a massive financial fraud designed to inflate Refco's financial position artificially until such time as it could be sold", Compl. ¶ 59, a fraud that included the hiding of

29

the RGHI Receivable. The Trustee seeks to recover transfers made to defendants under avoidance provisions of the Bankruptcy Code and to recover the value of the transfers under a theory of unjust enrichment.

105.    The complaint in the Agoglia Litigation was tendered to Arch for coverage under the Arch Policy by letters dated November 8 and November 21, 2007.

106.    The complaint in *Kirschner v. Thomas Hackl, et al.*, No. 07-9238 (S.D.N.Y.) (the "Hackl Litigation"), was filed on or about October 15, 2007.

107.    The Hackl Litigation was brought by the Trustee. The only individual defendant named in the complaint is Hackl. The Trustee alleges that Bennett, Hackl and others engaged in a scheme to hide the true financial condition of Refco, including efforts to hide the RGHI Receivable, and seeks recovery from Hackl under counts alleging, *inter alia,* breach of fiduciary duty, civil conspiracy, aiding and abetting fraud, and unjust enrichment.

108.    The complaint in *Kirschner v. Bennett, et al.*, Case No. 602869 (New York County, New York) (the "Trustee/Bennett Litigation"), was filed in the Supreme Court of New York on or about August 27, 2007, and was removed to federal court on or about September 17, 2007 as Case No. 07- 08165 (S.D.N.Y.).

109.    The plaintiff in the Trustee/Bennett Litigation identifies himself as the trustee of the Refco Private Actions Trust and assignee of all claims related to Refco belonging to, among others, certain former Refco customers who maintained accounts at, and entrusted funds to, RCM. The individual defendants named in the complaint are Bennett, Maggio, Trosten and Grant. The complaint alleges, *inter alia,* that these defendants engaged in a scheme to hide Refco's true financial condition, including engaging in steps to hide the RGHI Receivable. This

conduct allegedly induced RCM customers to entrust assets with RCM, which allegedly were later converted for Refco's use.

110.    The Trustee/THL Partners Litigation, the Grant Thornton Litigation, the Trustee/Bennett Litigation, the Agoglia Litigation and the Hackl Litigation are collectively referred to herein as the "Trustee Litigation."

111.    Upon information and belief, various governmental and/or regulatory investigations of or proceedings involving one or more of the defendants (the "Regulatory Matters") are ongoing, and one or more of the defendants has sought or may seek coverage for such matters.

112.    The proceedings discussed above, including the Criminal Proceedings, the Securities Litigation, the Derivative Litigation, the Bawag Action, the THL Funds Action, the Unovalores Action, the American Financial Action, the RCM Brokerage Customer Securities Litigation, the Trustee Litigation, and the Regulatory Matters, collectively are referenced herein as the "Underlying Matters."

## COUNT I

## DECLARATORY JUDGMENT THAT THE AWAC PRIOR KNOWLEDGE EXCLUSION BARS COVERAGE FOR THE UNDERLYING MATTERS

113.    Arch incorporates by reference each of the allegations of paragraphs 1 through 112 above.

114.    As of August 11, 2005, Bennett, Trosten and Maggio possessed knowledge of facts and circumstances that a reasonable person would suppose might afford valid grounds for a claim or that would indicate the probability of any such claim.

31

115.    The Underlying Matters consist of Claims alleging, arising out of, based upon, in consequence of, or attributable to such facts and circumstances.

116.    Arch seeks a declaration that based upon the AWAC Prior Knowledge Exclusion, the Arch Policy does not provide coverage for any loss arising out of the Underlying Matters.

### COUNT II

### DECLARATORY JUDGMENT THAT THE
### ARCH PRIOR KNOWLEDGE OR INFORMATION EXCLUSION
### BARS COVERAGE FOR THE UNDERLYING MATTERS

117.    Arch incorporates by reference each of the allegations of paragraphs 1 through 116 above.

118.    As of August 11, 2005, Bennett, Trosten and Maggio possessed knowledge or information concerning acts, errors, omissions, facts, matters or circumstances that might give rise to a Claim under the Arch Policy.

119.    The Underlying Matters consist of Claims arising out of, based upon, or attributable to such acts, errors, omissions, facts, matters or circumstances.

120.    Arch seeks a declaration that, based upon the Arch Prior Knowledge or Information Exclusion, the Arch Policy does not provide coverage for any loss arising out of the Underlying Matters.

### OTHER COVERAGE DEFENSES

121.    Other Arch Policy terms and conditions may ultimately be implicated.  Nothing in this Complaint should be construed as a waiver by Arch of any other coverage defenses under the Arch Policy or underlying policies with respect to any claim or potential claim and Arch reserves the right to raise all other terms and conditions of the Arch Policy and underlying policies as defenses to coverage as appropriate.

32

WHEREFORE, Arch requests that the Court enter a declaration and judgment in its favor:

A.    Declaring that, for the reasons set forth in Count I, the Arch Policy does not provide coverage to any Defendant for any Loss incurred in connection with the Underlying Matters;

B.    Declaring that, for the reasons set forth in Count II, the Arch Policy does not provide coverage to any Defendant for any Loss incurred in connection with the Underlying Matters;

C.    Awarding Arch such additional declaratory and other relief as shall be found to be appropriate under the circumstances; and

D.    Awarding Arch its fees and costs incurred in prosecuting this action.

Dated: February 21, 2008                    Respectfully submitted,

                                            VEDDER PRICE P.C.

                                            By: _____
                                                John H. Eickemeyer
                                                Daniel C. Green

                                            1633 Broadway
                                            47th Floor
                                            New York, New York  10019
                                            (212) 407-7700

                                            Of Counsel:

                                            Daniel J. Standish
                                            Marc E. Rindner
                                            Cara Tseng Duffield
                                            WILEY REIN LLP
                                            1776 K Street, NW
                                            Washington, DC 20006
                                            (202) 719-7000

                                            *Attorneys for Plaintiff*
                                            *Arch Insurance Company*

33

Exhibit F

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

ARCH INSURANCE COMPANY,

            Plaintiff,

    v.

JOHN D. AGOGLIA, *et al.*,

            Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Index No.: 08/600029

**STIPULATED ORDER FOR ENTRY
OF JUDGMENT AGAINST
DEFENDANT PHILLIP R. BENNETT**

      Plaintiff Arch Insurance Company ("Arch") and Defendant Phillip R. Bennett ("Bennett"), by and through their undersigned attorneys, jointly file this Stipulated Order for Entry of Judgment against Defendant Phillip R. Bennett.

      **WHEREAS**, Bennett previously sought coverage under the "Arch Policy" for the "Underlying Matters," as those terms are defined in the First Amended Complaint for Declaratory Judgment (the "FAC") filed by Arch on February 22, 2008;

      **WHEREAS**, Bennett has since acknowledged that he is not entitled to any coverage under the Arch Policy for the Underlying Matters or for any action, proceeding, investigation or other matter based upon, arising out of, or involving the facts and circumstances underlying or alleged in any of the Underlying Matters;

      **NOW, THEREFORE**, Arch and Bennett stipulate and agree as follows:

1.    Bennett waived formal service of process under C.P.L.R. 308 and acknowledged service and receipt of Arch's Amended Summons and the FAC on February 28, 2008;

2.    Bennett stipulates and agrees that the Arch Policy does not afford him any coverage whatsoever for any of the Underlying Matters or for any action, proceeding, investigation or other matter based upon, arising out of, or involving the facts and circumstances underlying or alleged in any of the Underlying Matters;

RECEIVED

APR 17 2008

NEW YORK
COUNTY CLERK'S OFFICE

3.    Bennett stipulates, agrees and consents to the entry of judgment against him on Counts I and II of the FAC in the form annexed hereto as Exhibit A;

4.    Bennett waives any right to appeal the judgment entered against him pursuant to this stipulation;

5.    Arch and Bennett stipulate and agree that each party is to bear its or his respective attorneys' fees and costs incurred in connection with this action and any other coverage litigation between the parties.

Date:   April 17, 2008                          Respectfully submitted,


_____                      _____
Jeffrey T. Golenbock                           John H. Eickemeyer
GOLENBOCK EISMAN ASSOR BELL                    Daniel C. Green
& PESKOE                                        VEDDER PRICE P.C.
437 Madison Avenue                             1633 Broadway, 47th Floor
New York, NY  10022                            New York, New York 10019
(212) 907-7373                                 (212) 407-7700

*Attorneys for Defendant Phillip R. Bennett*

                                               Daniel J. Standish
                                               Marc E. Rindner
                                               Cara Tseng Duffield
                                               WILEY REIN LLP
                                               1776 K Street, N.W.
                                               Washington, D.C. 20006
                                               (202) 719-7000

                                               *Attorneys for Plaintiff Arch Insurance Company*


**SO ORDERED, this ____ day of _____, 2008**


**By:** _____

# EXHIBIT A

EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

|  |  |
|---|---|
| ARCH INSURANCE COMPANY, | ) ) ) |
| Plaintiff, | ) ) Index No.: 08/600029 |
| v. | ) ) ) |
| JOHN D. AGOGLIA, *et al.*, | ) ) **[PROPOSED] JUDGMENT AGAINST** |
| Defendants. | ) **DEFENDANT PHILLIP R. BENNETT** ) ) ) ) |

Before the Court is Plaintiff Arch Insurance Company ("Arch") and Defendant Phillip R.

Bennett ("Bennett")'s Stipulated Order for Entry of Judgment against Defendant Phillip R.

Bennett. The Parties' Stipulated Order having been "so ordered" and entered by the Court, it is

hereby adjudged and declared that:

1.   Bennett waived formal service of process under C.P.L.R. 308 and acknowledged service and receipt of Arch's Amended Summons and the FAC on February 28, 2008;

2.   Pursuant to the Parties' stipulation, Bennett is not entitled to any coverage whatsoever under the Arch Policy for any of the Underlying Matters or for any action, proceeding, investigation or other matter based upon, arising out of, or involving the facts and circumstances underlying or alleged in any of the Underlying Matters;

3.   Pursuant to the Parties' stipulation, judgment is entered against Bennett on Count I of the FAC;

4.   Pursuant to the Parties' stipulation, judgment is entered against Bennett on Count II of the FAC;

5.   Bennett has waived any right to appeal the judgment entered against him; and

6.   Each party shall bear its or his respective attorneys' fees and costs incurred in connection with this action and any other coverage litigation between the parties.

By: _____
　　　Clerk

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK    )
                             ) ss.:
COUNTY OF NEW YORK  )

       FRANCINE TORMEY, being sworn, says:

       1.     I am not a party to the action, am over 18 years of age and reside in Queens, New York.

       2.     On April 17, 2008, I caused a true copy of the within **STIPULATED ORDER FOR ENTRY OF JUDGMENT AGAINST DEFENDANT PHILLIP R. BENNETT, WITH ANNEXED PROPOSED JUDGMENT AGAINST PHILLIP R. BENNETT** to be served by electronic and U.S. mail upon each defendant in this action through their counsel as follows:

| Defendant(s) | Counsel |
|---|---|
| Agoglia, John D.<br>McCarthy, Peter J. | William Fleming<br>Gage Spencer & Fleming, LLP<br>410 Park Avenue<br>New York, NY 10022<br>(212) 768-4900<br>wfleming@gagespencer.com |
| Bennett, Phillip R. | Jeffrey T. Golenbock<br>Golenbock Eisman Assor Bell &<br>Pesko LLP<br>437 Madison Avenue<br>New York, NY 10022<br>(212) 907-7373<br>jgolenbock@golenbock.com |

| | |
|---|---|
| Breitman, Leo R.<br>Gantcher, Nathan<br>Harkins, David V.<br>Jaekel, Scott L.<br>Lee, Thomas H.<br>O'Kelley, Ronald L.<br>Schoen, Scott A. | Paul A. Ferrillo<br>Weil Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, NY 10153<br>(212) 310-8372<br>Paul.ferrillo@weil.com |
| Cox, Edwin | Martin R. Bennett, Esq.<br>Kugle, Skelton & Bennett<br>130 E. Corsicana, Ste. 302<br>Athens, TX 75751<br>(903) 675-5151<br>mbennett@ksbpc.com |
| Dhillon, Sukhmeet<br><br>Lipoff, Eric | Neil A. Goteiner<br>Farella, Braun & Martel<br>235 Montgomery Street, 30th Floor<br>San Francisco, CA 94104<br>(415) 954-4485<br>ngoteiner@fbm.com |
| Dittmer, Thomas H. | Thomas C. Wolford<br>Neal Gerber & Eisenberg, LLP<br>2 North LaSalle Street<br>Chicago, IL 60602<br>(312) 269-5675<br>Twolford@ngelaw.com |
| Grady, Stephen | Lawrence J. Kotler<br>Duane Morris & Heckscher, LLP<br>30 South 17th Street<br>Philadelphia, PA 19103<br>(215) 979-1514<br>ljkotler@duanemorris.com |

| | |
|---|---|
| Grant, Tone | William A. Schreiner, Jr., Esq.<br>Zuckerman Spaeder LLP<br>1800 M Street, NW, Suite 1000<br>Washington, D.C. 20036<br>(202) 778-1858<br>wschreiner@zuckerman.com |
| Klejna, Dennis | Helen Kim<br>Katten Muchin Rosenman, LLP<br>2029 Century Park East, Suite 2600<br>Los Angeles, CA 90067<br>(310) 788-4525<br>Helen.kim@kattenlaw.com |
| Maggio, Santo C. | Scott E. Hershman<br>Hunton & Williams<br>200 Park Avenue, 43rd Floor<br>New York, NY 10166<br>(212) 309-1053<br>shershman@hunton.com |
| Mutterer, Frank | Janet Costello<br>Gibbons, P.C.<br>One Gateway Center<br>Newark, NJ 07102<br>973-596-4825<br>jcostello@gibbonslaw.com |
| Murphy, Joseph | John R. Jerome<br>Saul Ewing, LLP<br>245 Park Avenue<br>24th Floor<br>New York, NY 10167<br>jjerome@saul.com |

| | |
|---|---|
| Outridge, Richard N. | Claire P. Gutekunst<br>Proskauer Rose, LLP<br>1585 Broadway<br>New York, NY 10036<br>(212) 969-3421<br>cgutekunst@proskauer.com |
| Sexton, William M.<br>Sherer, Gerald | Ivan Kline<br>Friedman & Wittenstein, P.C.<br>600 Lexington Avenue<br>New York, NY 10022<br>(212) 750-8700<br>ikline@friedmanwittenstein.com |
| Silverman, Philip | Richard Cashman<br>Heller Ehrman, LLP<br>Times Square Tower<br>7 Times Square<br>New York, NY 10036<br>(212) 847-8796<br>Richard.cashman@hellerehrman.com |
| Trosten, Robert C. | Barbara Moses<br>Morvillo, Abramowitz, Grand, Iason<br>& Silberberg, PC<br>565 Fifth Avenue<br>New York, NY 10017<br>(212) 880-9540<br>bmoses@magislaw.com |

3.    On April 17, 2008, I caused a true copy of the within **STIPULATED ORDER FOR ENTRY OF JUDGMENT AGAINST DEFENDANT PHILLIP R. BENNETT, WITH ANNEXED PROPOSED JUDGMENT AGAINST PHILLIP R. BENNETT** to be served by U.S. mail upon Richard N. Outridge at 24 Pennbrook Drive, Lincoln University, Pennsylvania 19352.

_Francine Tormey_
FRANCINE TORMEY

Sworn to before me this
17th day of April, 2008

_Nancy J. Neubauer_
Notary Public

NANCY J. NEUBAUER
Notary Public, State of New York
No. 01NE5041602
Qualified in New York County
Commission Expires April 10, 2011

# Exhibit G

# VEDDERPRICE

VEDDER PRICE P.C.
1633 BROADWAY, 47TH FLOOR
NEW YORK, NEW YORK 10019
212-407-7700
FAX: 212-407-7799

CHICAGO • NEW YORK CITY • WASHINGTON, DC • ROSELAND, NJ

JOHN H. EICKEMEYER
212-407-7760
jeickemeyer@vedderprice.com

April 21, 2008

**BY HAND**

Hon. Helen E. Freedman
New York County Supreme Court
Commercial Division
60 Centre Street
New York, NY 10007

> **Re:    Arch Insurance Company v. Agoglia, et al.**
> **Index No. 08/600029**

Dear Justice Freedman:

We represent plaintiff Arch Insurance Company in the above action and enclose a courtesy copy of a Stipulation of Partial Discontinuance With Prejudice as against Defendant Santo C. Maggio ("Maggio"), executed by counsel for plaintiff and Maggio and filed earlier today with the Clerk of the Court.

We ask that the Court review the enclosed and, if it meets with your satisfaction, So Order the Stipulation.

We thank the Court for its consideration in this matter.

Respectfully submitted,

John H. Eickemeyer

Enclosure

cc:    Cara Tseng Duffield, Esq. (by electronic mail and regular mail)
        Marc E. Rindner, Esq. (by electronic mail and regular mail)
        Daniel J. Standish, Esq. (by electronic mail and regular mail)

        All Defense Counsel (by electronic mail and regular mail)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

ARCH INSURANCE COMPANY,                     )
                                            )
                                            )
                    Plaintiff,              )        Index No.: 08/600029
                                            )
        v.                                  )
                                            )
JOHN D. AGOGLIA, *et al.*,                  )        **STIPULATION OF PARTIAL**
                                            )        **DISCONTINUANCE WITH**
                    Defendants.             )        **PREJUDICE**
                                            )
                                            )
                                            )

        Plaintiff Arch Insurance Company ("Arch") and Defendant Santo C. Maggio ("Maggio"), by and through their undersigned attorneys, jointly file this Stipulation of Partial Discontinuance with Prejudice.

        **WHEREAS,** certain individuals have sought coverage under the "Arch Policy" for the "Underlying Matters," as those terms are defined in the First Amended Complaint for Declaratory Judgment (the "FAC") filed by Arch on February 22, 2008;

        **WHEREAS,** Maggio has acknowledged that he is not entitled to any coverage whatsoever under the Arch Policy for the Underlying Matters or for any other demand, action, proceeding or investigation, including, but not limited to, any demand, action, proceeding or investigation based upon, arising out of, or involving the facts and circumstances underlying or alleged in any of the Underlying Matters; and

        **WHEREAS,** no party to this action is an infant, incompetent or person for whom a committee has been appointed.

**NOW THEREFORE IT IS HEREBY STIPULATED AND AGREED,** by and between the undersigned, who have been duly authorized by Arch and Maggio to enter into this Stipulation, as follows:

1.     Maggio waives formal service of process under C.P.L.R. 308 and acknowledges service and receipt of Arch's Amended Summons and the FAC on March 6, 2008;

2.     Maggio agrees that the Arch Policy does not afford him any coverage whatsoever for any of the Underlying Matters or for any other action, proceeding or investigation, including, but not limited to, any matter based upon, arising out of, or involving the facts and circumstances underlying or alleged in any of the Underlying Matters;

3.     Maggio agrees that he will not seek coverage under the Arch Policy for any action, proceeding or investigation, including, but not limited to, any matter based upon, arising out of, or involving the facts and circumstances underlying or alleged in any of the Underlying Matters;

4.     Arch's causes of action asserted in the FAC are discontinued with prejudice as against Maggio only; and

5.     Each party shall bear its or his respective attorneys' fees and costs incurred in connection with this action and any other coverage litigation between the parties.

Dated: April _18_, 2008

Scott E. Hershman
HUNTON & WILLIAMS
200 Park Avenue
43rd Floor
New York, New York  10166
(212) 309-1053

*Counsel for Defendant Santo C. Maggio*

John H. Eickemeyer
Daniel C. Green
VEDDER PRICE P.C.
1633 Broadway, 47th Floor
New York, New York 10019
(212) 407-7700

Daniel J. Standish
Marc E. Rindner
Cara Tseng Duffield
WILEY REIN LLP
1776 K Street, N.W.
Washington, D.C. 20006
(202) 719-7000

*Counsel for Plaintiff Arch Insurance Company*

**SO ORDERED, this** _____ **day of** _____, **2008**

**By:** _____

-3-

Exhibit H

2007 10 05 hrg before Koetl

1

7a5QaxiC
1   UNITED STATES DISTRICT COURT
1   SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
2
3   AXIS REINSURANCE COMPANY,
3
4                    Plaintiff,
4
5            v.                          M-47 (JGK)
5
6   PHILLIP R. BENNETT, LEO R.
6   BREITMAN, NATHAN GANTCHER,
7   TONE GRANT, DAVID V. HARKINS,
7   SCOTT L. JAECKEL, DENNIS A.
8   KLEJNA, THAMAS H. LEE, SANTO
8   C. MAGGIO, JOSEPH MURPHY,
9   RONALD L. O'KELLEY, SCOTT A.
9   SCHOEN, WILLIAM M. SEXTON,
10  GERARD SHERER, PHILIP
10  SILVERMAN, ROBERT C. TROSTEN,
11  AND DOES 1 TO 10,
11
12                   Defendants.
12
13  ------------------------------x
13                                      New York, N.Y.
14                                      October 5, 2007
14                                      10:25 a.m.
15
15  Before:
16
16                    HON. JOHN G. KOELTL,
17
18                                      District Judge
19
20
21
22
23
24
25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

2

7a5QaxiC
1                        APPEARANCES
1
2   KAUFMAN, BORGEEST & RYAN, LLP
2        Attorneys for Plaintiff
3   JOAN M. GILBRIDE
3   ROBERT A. BENJAMIN
4
5   BAKER & HOSTETLER
6        Attorneys for Appellee Klejna
6   HELEN B. KIM
7
7   FRIEDMAN & WITTENSTEIN, PC
8        Attorneys for Appellees Sexton and Sherer
8   IVAN O. KLINE
9
9   HELLER EHRMAN, LLP
                          Page 1

2007 10 05 hrg before Koetl

<pre>
10          Attorneys for Appellee Silverman
10   RICHARD CASHMAN
11
12   MORVILLO, ABRAMOWITTZ, GRAND, IASON, ANELLO & BOHRER, PC
12          Attorneys for Robert Trosten
13   BARBARA MOSES
13
14
14   GOLENBOCK, EISEMAN, ASSOR, BELL & PESKOE, LLP
15          Attorneys for Phillip Bennett
15   JEFFREY T. GOLENBOCK
16
16   WEIL, GOTSHAL & MANGES, LLP
17          Attorneys for Director Defendants
17   MICHAEL F. WALSH
18
18
19   SAUL EWING, LLP
19          Attorneys for Joseph Murphy
20   JOHN J. JEROME
21
22   ZUCKERMAN, SPAEDER, LLP
22          Attorneys for Tone Grant
23   LAURA E. NEISH
24
25
</pre>

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3

⬜

7a5QaxiC

<pre>
 1          (In open court)
 2          THE DEPUTY CLERK:  With regard to the matter of Axis
 3   Reinsurance, all parties please state who they are for the
 4   record.
 5          MS. GILBRIDE:  Good morning, your Honor. Joan
 6   Gilbride, Kaufman, Borgeest & Ryan for Axis Reinsurance
 7   Company.  With me is Robert Benjamin of the same firm.
 8          THE COURT:  Good morning.
 9          MS. MOSES:  Good morning, your Honor.  Barbara Moses,
10   Morillo, Abramowitz for Robert Trosten, who is one of the
11   plaintiffs in the Grant adversary.
12          MR. WALSH:  Good morning, your Honor.  Michael Walsh
13   from Weil, Gotshal & Manges.  We represent Leo Breitman, Nathan
14   Gantcher, David Harkins, Scott Jaeckel, Thomas Lee, Ronald
15   O'Kelley, Scott Schoen, often referred to as the Director
16   Defendants.
17          MR. KLINE:  Good morning, your Honor.  Ivan Kline from
18   Friedman & Wittenstein for William Sexton and Gerard Sherer who
19   are two of the what's been labeled as the counterclaimants
20   among the officers.
21          MS. KIM:  Good morning, your Honor.  Helen Kim, Baker
22   & Hostetler, counsel for Dennis Klejna, who is a counterclaim
23   plaintiff in the Axis Adversary proceeding.
24          MR. GOLENBOCK:  Good morning, your Honor.  Jeffrey
25   Golenbock of Golenbock, Eiseman for Phillip Bennett in the
</pre>

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4

⬜

7a5QaxiC

<pre>
 1   Grant against Axis proceeding.
 2          MR. CASHMAN:  Good morning, your Honor.  Richard
 3   Cahman of Heller, Ehrman for Philip Silverman.  He's one of the
 4   counterclaim plaintiffs.
</pre>

Page 2

                          2007 10 05 hrg before Koetl
 5              MR. JEROME:  Good morning, your Honor.  John Jerome
 6    for Joseph P. Murphy.
 7              MS. NEISH:  Good morning, your Honor.  Laura Neish,
 8    Zuckerman, Spaeder for Tone Grant.
 9              THE COURT:  Good morning, all.  I know lawyers at
10    various of your firms, but nothing about that affects anything
11    that I do in the case, and I don't believe that I know any of
12    you individually, but in any event, nothing about that affects
13    anything I do in the case.
14              This is a motion to withdraw the reference.  I've read
15    the papers.  I'm prepared to listen to argument.
16              MS. GILBRIDE:  Good morning, your Honor.  Joan
17    Gilbridge for Axis Reinsurance Company.  Your Honor, we're here
18    this morning on a motion to withdraw the reference to
19    bankruptcy court, and our motion is based upon the interest of
20    judicial economy, fairness, and efficiency.  At an August 30
21    hearing in the bankruptcy court, the bankruptcy court judge
22    strongly suggested that one of the parties to the adversary
23    proceeding at the time make this motion to withdraw the
24    reference.  In fact, he indicated that on the record at least
25    twice.  I believe that the bankruptcy --
                      SOUTHERN DISTRICT REPORTERS, P.C.
                               (212) 805-0300
                                                                    5

      7a5QaxiC
 1              THE COURT:  Let me give you a perspective, having read
 2    the papers, and then you can at least speak to that
 3    perspective.  It appears to me that the bankruptcy court is
 4    making a distinction between the underlying coverage dispute
 5    and the issue of the advancement of fees.  He made that
 6    distinction by dismissing your complaint and granting a
 7    preliminary injunction for the advancement of fees, and he
 8    viewed the advancement of fees as a legal question to be
 9    decided as a matter of law.  He's teed up the issue, so to
10    speak, for the motions for summary judgment to be heard before
11    him on October 12.  There's a new adversary proceeding, but
12    based on everything that the bankruptcy court has said, one
13    would expect that at some time the bankruptcy court will not
14    take jurisdiction over that aspect of the adversary proceeding,
15    which is the coverage issue, and proceed to decide the
16    advancement issue; and if he didn't do that, it's that coverage
17    issue that he considered to be so intertwined with what was at
18    issue before Judge Lynch that he thought he shouldn't decide,
19    one would expect that he would do that with a new adversary
20    proceeding also.  If he didn't do that, there could always be a
21    motion to withdraw the reference with respect to that.  But the
22    motion to withdraw the reference now comes to me about a week
23    before the bankruptcy judge is going to hear the issue of
24    summary judgment on the advancement of fees.
25              So, I don't read what the bankruptcy court has said
                      SOUTHERN DISTRICT REPORTERS, P.C.
                               (212) 805-0300
                                                                    6

      7a5QaxiC
 1    inviting the withdrawal of the reference to be an invitation to
 2    withdraw the reference from him on the issue of the advancement
 3    fees which he's plainly divided from the issue of coverage.
 4              MS. GILBRIDE:  Your Honor --
 5              THE COURT:  That's why I interjected myself when you
 6    got to the point that the bankruptcy court has invited the
 7    motion to withdraw the reference.  The bankruptcy court in fact
 8    has said, I am compelled to decide the issue of the motion for
 9    summary judgment on the advancement of fees unless the motion
                                 Page 3

2007 10 05 hrg before Koetl
10    is withdrawn, and the bankruptcy judge knows that there's a
11    motion to withdraw the reference.
12            MS. GILBRIDE:  I understand.  That's the procedural
13    history of the matter your Honor.  Frankly, you know, we
14    disagree with the bankruptcy court's bifurcation of the issues,
15    if you will.  That's an issue that is going to come before this
16    court, clearly.
17            THE COURT:  Right.  And that's an issue with respect
18    to the varying interpretations of the contract as to when it
19    says covered costs, what does that mean?
20            MS. GILBRIDE:  Right.  Our position is that the
21    question of coverage is the threshold issue that a court has to
22    look at before it gets to this advancement issue, and that's
23    the position we've advocated --
24            THE COURT:  But that's not what the bankruptcy court
25    is doing.  And if that's wrong, the bankruptcy court will make
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    7
        7a5QaxiC
1    that same error when it decides the motion for summary
2    judgment.  That error will then be reviewed by this court.  If
3    error, it will be reversed.
4            MS. GILBRIDE:  Your Honor, I believe it's in the
5    interest of judicial economy that rather than let that error
6    occur, that a withdrawal be granted now so that the issue and
7    all of the issues that -- you know, the issues that are pending
8    before Judge Lynch, the issues that overlap or are duplicated
9    all be decided in one forum; otherwise, there's the possibility
10    of conflicting results --
11            THE COURT:  What conflicting results?  The only issue
12    that the bankruptcy court has indicated that it's going to be
13    deciding is the issue of contract interpretation, which you all
14    told me last time doesn't require any development of the facts.
15    It does not require any parol evidence.  Both sides agree it's
16    a question of pure contract interpretation.
17            MS. GILBRIDE:  Your Honor, just so the record is
18    clear, our position is that it is a question of pure contract
19    interpretation, but the insureds are arguing that there's an
20    ambiguity.  Our position on that is if there is an ambiguity,
21    the court must look at extrinsic evidence.  There's been no
22    opportunity for any discovery in the bankruptcy proceeding.
23    That's the position we've taken in response to the summary
24    judgment motion.
25            THE COURT:  OK.  You can correct me if I'm wrong, but
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    8
        7a5QaxiC
1    I thought that the parties when they appeared before me last
2    time said that the issue -- but I could be mistaken.  I thought
3    that your position was that the issues with respect to the
4    interpretation for advancement of costs was an issue strictly
5    of contract interpretation that could and should be determined
6    solely on the basis of the contract.
7            MS. GILBRIDE:  Your Honor, I mean, certainly our
8    position of the contract is clear.  That's our position.  We
9    are not pushing for summary judgment.  That's not our motion,
10    but all I'm saying is that if the court, the bankruptcy court,
11    was to perceive an ambiguity, which it appears that's the way
12    he's going, then that would be the basis for the ruling, that
13    our position in opposition to the motion is that you need to
14    look at extrinsic evidence.  There's been no extrinsic evidence
                            Page 4

2007 10 05 hrg before Koetl
15  introduced, and there's been no time for discovery, and that's
16  going to become an issue.  I have no idea whether or not that's
17  argument that would be persuasive, but that's certainly our
18  position, and I don't believe we've taken a inconsistent
19  position in that regard.
20          THE COURT:  Is there only one motion for summary
21  judgment pending before the magistrate judge -- before the
22  bankruptcy court?
23          MS. GILBRIDE:  There's actually, I think, technically
24  four motions.  There are four groups of defendants, and I don't
25  want to misspeak.  I'm sure lawyers will tell you if I'm wrong,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                                    9

7a5QaxiC
1  but I believe they're essentially the same arguments.  There's
2  some slight differences, but they're more or less the same
3  arguments, but there are four pending motions for summary
4  judgment.
5          THE COURT:  All by the insureds?
6          MS. GILBRIDE:  Yes.  Yes.  We've also made a
7  cross-motion for summary judgment on a very limited issue with
8  respect to repayment.  Our argument there is that if the court
9  is to order advancement of defense costs, that based on the
10  contract if there's a later determination that there is no
11  coverage, that we should be entitled to repayment.
12          THE COURT:  I thought there were cross-motions, that's
13  why I -- OK.
14          MS. GILBRIDE:  We filed cross-motion.  That's the only
15  other cross-motion that there is.
16          In any event, your Honor, we believe that this matter
17  is properly before the district court.  I believe that the
18  bankruptcy court made that clear.  Perhaps we misread what he
19  was saying.  He certainly said that he could bifurcate these
20  issues, and that he felt that he was constrained to rule upon
21  this advancement issue if he kept it because it didn't overlap.
22  Our position is that it overlaps.  There's no way that you can
23  read that policy and not conclude that there's an overlap
24  between the word coverage and the advancement of defense costs.
25  So I don't --
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                                    10

7a5QaxiC
1          THE COURT:  You can explain to me -- I'm sure you've
2  explained this to the bankruptcy judge also -- why the ultimate
3  questions of whether there are exclusions in the policy or
4  whether the warranty letter meant that it will eventually be
5  determined that these defense costs are not payable costs under
6  the policy is necessarily the same as the issue of whether the
7  policy gives the insurance company the right at the outset in
8  deciding whether these are covered defense costs to make that
9  determination and refuse to pay.
10          The bankruptcy judge doesn't seem to be under any
11  desire to rule at this point whether any of the exclusions or
12  the warranty letter mean that ultimately the insurance company
13  does not have to pay, but the bankruptcy judge says, I will
14  decide as an initial matter a question of contract
15  interpretation whether the insurance company must at least
16  advance the costs and cannot simply rely upon alleged
17  exclusions under the policy, which may eventually be found to
18  be a defense for the insurance company to ultimate payment, and
19  may require the insureds to repay defense costs.  I will
                                Page 5

2007 10 05 hrg before Koetl
20    interpret the policy to determine whether under the policy the
21    insurance company has the obligation to advance the defense
22    costs in the same way that the prior insurers all advanced
23    defense costs. And I'm not going to get into the ultimate
24    merits of the exclusions, but I will simply make the initial
25    question of advancement, and you say, well, your interpretation

                                                                    11

7a5QaxiC
1     of the policy is wrong.
2             I understand that. And if you prevail on that
3     question of contract interpretation, then you'll not be
4     required to advance the costs, but the bankruptcy court will
5     never reach, as I read what he's doing, the ultimate question
6     of whether you are ultimately right on the issue that there are
7     exclusions here that will ultimately be a defense that you'll
8     never have to pay, and to the extent that you've advanced
9     costs, they will have to be repaid.
10            But both sides are arguing out to the bankruptcy judge
11    solely the issue of advancement and whether the interpretation
12    of the policy gives the insurance company the right at the
13    outset to define the covered defense costs to include -- to
14    gives the insurance company the right to say, well, because we
15    believe there is an exclusion, we don't have to advance.
16            MS. GILBRIDE: Your Honor, that's precisely the reason
17    why we think the reference should be withdrawn.
18            THE COURT: Why?
19            MS. GILBRIDE: Because the two issues are interwoven.
20    You can't decide -- I think it's clear under New York law that
21    you can't decide whether there's coverage unless you look at
22    the insuring agreement and the exclusions. So, the bankruptcy
23    court needs to do that, and the bankruptcy court has made it
24    clear that he doesn't think that he can do that because of the
25    overlap with the matters before the district court.

                                                                    12

7a5QaxiC
1             So, I'm not quite sure how we get to this ruling on
2     advancement without acknowledging the fact that there's overlap
3     with the matter that's pending in the district court. Covered
4     defense costs -- to get to interpret the phrase covered defense
5     costs, it's clear under New York law that you have to look at
6     what's covered and what's excluded. And if you start looking
7     at what's excluded, you have to start looking at the facts that
8     the bankruptcy court has already determined are overlapping
9     with what's in the district court.
10            THE COURT: But it's plain, isn't it, that the
11    bankruptcy court is not going to do that. The bankruptcy court
12    is not going to -- and you can correct me if I'm wrong -- I'm
13    just reading the record and seeing what the bankruptcy court is
14    saying at this point. He hasn't yet decided the motions for
15    summary judgment. The bankruptcy court isn't going to rule on
16    the merits on any of the exclusions, in which case he will say
17    that's error, and that will be a matter of law that will then
18    be up on appeal, but he's not going to touch the merits of the
19    exclusions.
20            MS. GILBRIDE: I think you're absolutely right that
21    based on the record that exists, the extent of briefing and the
22    record that exists, that appears to be where the bankruptcy
23    court is going.
24            THE COURT: And then there will be this nice issue of
                                Page 6

2007 10 05 hrg before Koetl
25   law of contract interpretation on the issue of advancement
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

13

7a5QaxiC
1   which will come up on appeal to the district court, and then to
2   the extent that there is anything left in the bankruptcy court,
3   the bankruptcy court has indicated, though not yet ruled, I
4   believe -- you can correct me if I'm wrong -- that whatever
5   remains of the other adversary proceeding, the bankruptcy has
6   no reason to believe that the bankruptcy court would hear that
7   any more than he heard the rest of your case, and then the
8   issue of the exclusions and coverage will all be before
9   eventually Judge Lynch.
10          MS. GILBRIDE:  Your Honor, it's our position that the
11   bankruptcy court believes -- it's our position that the
12   bankruptcy court expressed a clear preference to -- what we
13   heard -- that he rather not do that, that he doesn't think
14   that's efficient.
15          THE COURT:  Which?
16          MS. GILBRIDE:  To have this bifurcation of issue.  He
17   obviously said he could do it and he must do it because he had
18   jurisdiction, but the indication throughout the record was that
19   the reference should be withdrawn and that the issues of
20   coverage overlapped clearly with what was before the district
21   court.  I think the bankruptcy court felt constrained to keep
22   these counterclaims and perhaps didn't realize they were as
23   broad as they actually are.  I think the bankruptcy court
24   thought they were limited just to advancement.  They're not.
25   when you look at them, they are as broad as our claims were.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14

7a5QaxiC
1   They seek a declaration of coverage.
2          I think you're absolutely right that there is no
3   question that he will only rule upon this advancement issue.
4   He has not dismissed the remainder of the counterclaims or
5   anything extraneous to the advancement issue yet in the
6   bankruptcy court, but I'm sure that he will.
7          THE COURT:  And if he doesn't, there would be nothing
8   to prevent a subsequent motion to withdraw the reference if the
9   bankruptcy judge should be going beyond the issue of
10   advancement, right?  And under the statute, cases can be
11   withdrawn in whole or in part, so it would be possible to
12   fashion this either by what the bankruptcy court does or a
13   subsequent motion to withdraw the reference to assure that
14   there's no overlap between the action that you've filed now in
15   the district court and what remains in the bankruptcy court.
16          MS. GILBRIDE:  Your Honor, obviously, we've been told
17   or the argument is that this motion to withdraw the reference
18   is not timely.  I'm sure if there was a subsequent motion,
19   there would be issues about timeliness raised as well.
20          THE COURT:  I think I can make it clear that if I
21   thought the present motion was untimely because it comes at a
22   point that suggests that it may have tactical reasons in view
23   of where it comes in the bankruptcy court proceeding, that
24   those considerations will not affect the subsequent decision
25   with respect to a withdrawal of the reference with respect to
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

15

7a5QaxiC

Page 7

2007 10 05 hrg before Koetl
1  whatever remains in the bankruptcy court.
2          MS. GILBRIDE:  Your Honor, there are remaining issues
3  in the district court, obviously.  There's our complaint that
4  we filed.  There is -- inevitably this case, the question of
5  coverage is going to be before a court, and we believe strongly
6  and think the bankruptcy court steers in this direction that it
7  should all be decided by one court, and I think the bankruptcy
8  court thought the appropriate court for that was Judge Lynch
9  since he had the underlying litigation; that there were
10 connections in terms of discovery, settlement, all sorts of
11 issues for practical purposes that he thought this coverage
12 dispute should be before the district court.  I think the
13 timely time to do that would be now before there's further
14 rulings by the bankruptcy court that will just involve appeals
15 and countless more motions and judicial resources being
16 utilized when it could all be decided in one place.
17          THE COURT:  Are the motions fully briefed before the
18 bankruptcy judge?
19          MS. GILBRIDE:  The reply briefs have not been filed
20 yet.  The motion was filed.  The oppositions were filed, and
21 we're still waiting forth reply briefs.
22          THE COURT:  When is the reply brief to be filed?
23          MS. GILBRIDE:  The 10th.  The hearing is on for the
24 12th.  So, your Honor, it's our position that in the interest
25 of judicial efficiency, the motion to withdraw the reference
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

                                                                16

7a5QaxiC
1  should be granted at this time, and for all the reasons set
2  forth in our papers.  Do you have any questions, your Honor?
3          THE COURT:  No.  Thank you, you've helped me in terms
4  of understanding the case.  Thank you.
5          Ms. Moses.
6          MR. WALSH:  Thank you, your Honor.  I represent
7  Mr. Trosten.  I'm also going to speak extremely briefly this
8  morning on behalf of the other Grant plaintiffs, Mr. Grant and
9  Mr. Bennett, and on behalf of the counterclaimants in the Axis
10 adversary who are Messrs. Klejna, Murphy, Sexton, Sherer and
11 Silverman.  And if I've forgotten anyone, I'm sure my
12 co-counsels will let me know.  Mr. Walsh to my right, I believe
13 wishes to also speak on behalf of the Breitman plaintiffs.  I
14 will be very brief, your Honor.
15          I really just want to touch on two points.  The first
16 is the bankruptcy court's intent, and the second is the
17 possibility of inconsistent results absent a withdrawal of the
18 reference.
19          With respect to the bankruptcy court's intent, I think
20 your Honor correctly read what Judge Drain had in mind, and I
21 think the most relevant page of the transcript below is page 82
22 of the August 30 transcript where Axis' counsel actually said
23 to Judge Drain, referring to the advancement claims:  "You're
24 asking us to go to another courthouse to litigate this."  And
25 the court said no.  Judge Drain said, "No, I'm asking you to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

                                                                17

7a5QaxiC
1  tell me whether in fact your client is going to pay or not,"
2  and then the court said that it would be happy to determine
3  those issues, the advancement issues in the bankruptcy court.
4  So I think your Honor got it exactly right.
5          With respect to the possibility of inconsistent
                              Page 8

2007 10 05 hrg before Koetl
6    results, I think, given where this case is and how the issues
7    have been teed up in the bankruptcy court, there's zero
8    possibility of inconsistent results.  And I say that for two
9    reasons.  First, as your Honor just pointed out, Judge Drain
10   has made it very clear that the issue he intends to decide a
11   week from today on summary judgment is the narrow contract
12   interpretation issue of whether under the language of the Axis
13   policy and the underlying policy Axis has an interim funding
14   obligation which continues in the face of an unresolved dispute
15   over ultimate issues of coverage and liability.
16             If Judge Drain were to grant summary judgment for the
17   insureds on that issue, obviously that could not possibly
18   conflict or overlap with anything Judge Lynch is doing with
19   regard to the securities fraud class action.
20             Now, Axis, of course, argues the opposite of that
21   question.  And if Axis should prevail next Friday on the 12th
22   and if Judge Drain at that point should change his tentative
23   view and should agree that he has to look at the underlying
24   fraud issues, the broader coverage issues, in order to
25   determine the advancement question, he's made it clear that
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                                  18

7a5QaxiC
1    he's not going to do that.  He actually said on page 58 of the
2    September 11 transcript, that if he were to come out that way,
3    then there would be an overlap, and at that point this
4    adversary proceeding, referring to the Grant proceeding, and
5    the adversary proceeding brought by the counterclaim parties
6    would be either stayed or dismissed without prejudice pending
7    the development of those facts in the multisecurities district
8    litigation.
9             So either way he goes, your Honor, there's zero danger
10   that Judge Drain is going to make rulings on those coverage
11   issues, those fraud-related issues, which would pose a danger
12   with being inconsistent with anything Judge Lynch or Judge
13   Buchwald has done or is going to do in the district court with
14   respect to those overlapping fraud issues.
15             So I would submit, your Honor, that looking at the
16   ultimate questions which are efficiency and uniformity, that
17   this case actually comes to you in a posture very similar to
18   two prior withdrawal cases that your Honor decided and that are
19   cited to you in the papers In Re Ames and In Re Formica, and
20   that the most efficient thing to do is clearly to let Judge
21   Drain decide the summary judgment motions that he's got teed up
22   and ready to go a week from today.  Thank you.
23             THE COURT:  OK.
24             MR. WALSH:  Your Honor, Michael Walsh on behalf of the
25   Director Defendants.  I think just about everything has been
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                                  19

7a5QaxiC
1    covered.  I just want to make two very quick points.  Axis'
2    counsel stated that if there is an issue of ambiguity on the
3    contract, the court would have to look at evidence that's
4    outside the contract.  I think obviously that will be argued
5    better in front of the bankruptcy court but argued would be
6    that ambiguity as a matter of law would be held against the
7    insurer and in favor of the insureds, so even if there is
8    ambiguity, I don't think we would go beyond the contract.
9             Second, Axis, I think, may have implied that all of
10   the directors and officers have these counterclaims that the
                           Page 9

2007 10 05 hrg before Koetl
11    court has not disposed of.  Certainly, the Director Defendants
12    are seeking advancement only and are not seeking a
13    determination in the bankruptcy court of the larger issue of
14    liability of Axis under the policy.
15          THE COURT:  What's your position with respect to the
16    proceedings before the bankruptcy court and whether they're
17    core or non-core?
18          MR. KLINE:  I think that a strict interpretation of
19    the contract is not a core proceeding, and I don't think we
20    were as clear in our papers on that issue as I wish we were,
21    but I think the point we were making is that in looking at the
22    core/non-core issue as a factor in withdrawal, the reason to
23    look at that is for two reasons:  One is the issue of the scope
24    of review, and the other is the issue of the expertise of the
25    bankruptcy court.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    20

7a5QaxiC
1           On the scope of review, clearly we're saying that this
2     is a question of law.  So that's review de novo and that does
3     not help our argument.  But in terms of the expertise of the
4     bankruptcy court and the understanding of what this dispute
5     means to the rest of the bankruptcy court does fall within the
6     bankruptcy court's expertise and is a factor -- although we
7     don't think determinative -- it is a factor that this court
8     could take into account in making the decision.
9           THE COURT:  Thank you for your frankness.  The papers
10    that various insureds submitted were not consistent that the
11    proceedings as to which withdrawal is sought are in fact
12    non-core proceedings.  In fact, they tried to say that the
13    bankruptcy judge has found that they are core proceedings, and
14    it's not clear to me that the bankruptcy court has made such a
15    finding.
16          MR. KLINE:  That may have been our papers, your Honor.
17    I think all we are trying to say is that the bankruptcy court
18    referred to provisions of the plan or relief from the stay as
19    being core, and that those issues were implicated by his
20    decision, but the contract interpretation itself we did not
21    mean to imply was core at all.
22          THE COURT:  OK.  Anyone else?  No.  I'm prepared to
23    decide.
24          The defendant, Axis Reinsurance Company ("Axis") has
25    filed a motion to withdraw the reference from the United States
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    21

7a5QaxiC
1     Bankruptcy Court for the Southern District of New York ("the
2     Bankruptcy Court") in the consolidated adversary proceedings.
3     Axis argues that the adversary proceedings are non-core
4     proceedings, and therefore the reference should be withdrawn in
5     the interest of judicial economy, particularly in light of the
6     fact that certain of the insureds have demanded a jury trial.
7           In relevant part, 28 U.S.C. Section 157(d) provides:
8     "The district court may withdraw, in whole or in part, any case
9     or proceeding referred under this section, on its own motion or
10    on timely motion of any party, for cause shown."  While the
11    statute does not define the phrase "for cause," courts have
12    focused on whether the proceeding is core or non-core as well
13    as considerations of judicial economy and uniformity in the
14    administration of bankruptcy law.  See, for example, Orion
15    Pictures Corporation v. Showtime Networks, Inc.  (In re Orion
                               Page 10

2007 10 05 hrg before Koetl

16  Pictures Corp.), 4 F.3d, 1101, (2d Cir. 1993); Hunnicutt Co. v.
17  TJX Cos.  (In re Ames Department Stores, Inc.), 190 B.R. 157,
18  162, (S.D.N.Y. 1995).
19          "There is no specific time limit for applications
20  under 28 U.S.C. Section 157 to withdraw a reference to the
21  bankruptcy court..."  Lone Star Industries, Inc. v. Rankin
22  County Economic Development District.  (In re New York Trap
23  Rock Corp.), 158 B.R. 574, 577, (S.D.N.Y. 1993).  In situations
24  where timeliness is not governed by a specific timetable, the
25  court must assess timeliness in the context of the parties'

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

22

7a5QaxiC
1   interactions throughout the course of the litigation in the
2   bankruptcy court.  Id.  Therefore, "courts in this Circuit have
3   defined 'timely' to mean 'as soon as possible after the moving
4   party has notice of the grounds for withdrawing the
5   reference.'"  Official Committee of Unsecured Creditors of FMI
6   Forwarding Co., Inc. v. Union Transport Corp.  (In re FMI
7   Forwarding Co., Inc.), No. 04 Civ. 630, 2005 WL 147298, at *6
8   (S.D.N.Y. Jan. 24, 2005 (quoting Kentile Floors, Inc. v.
9   Congoleum Corp.  (In re Kentile Floors, Inc.) No. 95 Civ.,
10  2470, 1995 WL 479512, at *2.  (S.D.N.Y Aug. 10, 1995)).
11          Based on the particular circumstances at issue, a
12  delay that is acceptable in one case may not be acceptable in
13  another case.  Id.; compare Connolly v. Bidermann Industries
14  U.S.A., Inc., No. 95 Civ. 1791, 1996 WL 325575, at *3 (S.D.N.Y
15  June 13, 1996  (finding timely a motion to withdraw reference
16  filed after a delay of eight months), with  In re Kentile
17  Floors, Inc., at *2 (finding timely a motion to withdraw
18  reference filed after a delay of nine months, where the parties
19  had been in mediation for several months and the motion was
20  filed promptly after mediation was abandoned).  It is clear,
21  however, that "[d]elay for tactical reason, such as forum
22  shopping, or which prejudices the opposing party or the
23  administration of justice, can be grounds for denying" a motion
24  for withdrawal.  In re FMI Forwarding Co., at *6; see also In
25  re New York Trap Rock Corp. 158 B.R. at 577.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

23

7a5QaxiC
1           In this case, the motion is not timely.  Axis had
2   notice of the grounds for withdrawal at the time it filed its
3   declaratory action in bankruptcy court in May but instead chose
4   to invoke the bankruptcy court's jurisdiction pursuant to 28
5   U.S.C. Section 157(c).  The motion to withdraw the reference
6   was filed more than three months after Axis filed its complaint
7   in the bankruptcy court.  In the interim, the parties expended
8   resources litigating in that forum, and the bankruptcy court
9   dismissed Axis's complaint, entered preliminary injunctions,
10  and scheduled a hearing on October 12, 2007 to decide
11  cross-motions for summary judgment.
12          Axis argues that the motion is timely because it filed
13  its motion only one week after the bankruptcy court dismissed
14  its complaint.  However, this argument ignores the fact that
15  Axis waited for more than three months to file its motion and
16  only sought removal to this court after the adverse decision in
17  the bankruptcy court on the motion for a preliminary injunction
18  and on the motion to dismiss.  Up to that point, Axis was
19  willing to allow the bankruptcy court to adjudicate all the
20  issues in its complaint, including the advancement issue, and

Page 11

2007 10 05 hrg before Koetl
21   the bankruptcy court expended considerable time and energy in
22   becoming familiar with the facts and legal issues involved,
23   particularly on the advancement issue.  The motion for
24   withdrawal of the reference is made shortly before the
25   bankruptcy court is scheduled to hear oral argument on the
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

7a5QaxiC
1   cross-motions for summary judgment on the advancement issue and
2   appears to be a tactical effort to avoid the bankruptcy court's
3   decision on that issue, which will be fully reviewable on an
4   appeal to this court.  On the basis of timeliness alone, the
5   motion for withdrawal of the reference should be denied.
6          Even if the motion was timely, Axis has failed to show
7   sufficient cause to warrant withdrawal at this time.  Under the
8   framework established by the Court of Appeals for the Second
9   Circuit, the threshold question with respect to "cause shown"
10  is whether the case involves a core or non-core proceeding,
11  "since it is on this issue that questions of efficiency and
12  uniformity will turn."  In re Orion Pictures Corp. 4 F.3d at
13  1101.  After the district court "makes the core/non-core
14  determination, it should weigh questions of efficient use of
15  judicial resources, delay and cost to the parties, uniformity
16  of bankruptcy administration, the prevention of forum shopping
17  and other related factors," such as the presence of a jury
18  demand.  Id.; see also Kenai Corp. v. National Union Fire
19  Insurance Co. (In re Kenai Corp.), 136 B.R. 59, 61, (S.D.N.Y.
20  1992).
21          To be a core proceeding, the proceeding must "arise
22  under" Title 11 or "arise in" a bankruptcy case under Title 11.
23  See Mt. McKinley Insurance Co. v. Corning Inc., 399 F.3d 436,
24  447-48 (2d Cir. 2005).  With respect to claims arising from
25  contracts, the important factors are whether the contract is
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

7a5QaxiC
1   antecedent to the reorganization petition and the degree to
2   which the proceeding is independent of the reorganization.
3   United States Lines, Inc. v. American Steamship Owners Mutual
4   Protection and indemnity Association, Inc., 197, F.3d, 631, 637
5   (2d Cir. 1999).
6          The insureds now concede that the adversary
7   proceedings here are non-core proceedings.  The causes of
8   action do not arise under the Bankruptcy Code and would exist
9   in the absence of a bankruptcy case.  The proceedings involve
10  the interpretation of a pre-petition and insurance contract as
11  it relates to non-debtors and therefore are sufficiently
12  removed from the reorganization to be considered non-core.
13          In general, the fact that the proceeding is a non-core
14  proceeding, weighs in favor of withdrawal because in non-core
15  proceedings decisions by the bankruptcy court are subject to
16  de novo review in the district court.  In re Orion Pictures
17  Corp., 4 F.3d at 1101.  The fact that a proceeding is non-core,
18  however, is not determinative because "[i]n the final analysis,
19  the critical question is efficiency and uniformity."  In re FMI
20  Forwarding Co. at *5.
21          Therefore, the argument for withdrawal based on the
22  non-core nature of the proceedings is significantly lessened in
23  situations where the bankruptcy court has already expended
24  significant resources on the case and where other factors weigh
25  strongly against withdrawal.  It would be an inefficient use of
                       Page 12

2007 10 05 hrg before Koetl
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

26

7a5QaxiC

1   judicial resources to withdraw this proceeding from the
2   bankruptcy court at this time and lose the advantage of the
3   bankruptcy court's views on the dispute relating to the
4   advancement of fees.
5            Axis only sought to remove the reference after the
6   bankruptcy court dismissed its complaint and granted
7   preliminary injunctions requiring it to advance defense costs.
8   Facing a potential permanent junction requiring the advancement
9   of fees by the bankruptcy court, Axis now moves to withdraw the
10  reference.  In situations where the timing and circumstances of
11  a motion to withdraw the reference raise a strong inference of
12  forum shopping, the motion should be denied.  See, for example,
13  In re New York Trap Rock Corp. 158 B.R. at 577 (noting that
14  withdrawing the reference 11 days after adverse findings by the
15  bankruptcy court "would reward forum shopping"); In re Kenai
16  Corp. 136 B.R. at 61.
17           Axis' argument that its motion is made at the
18  suggestion of the bankruptcy court and is therefore timely and
19  not motivated by forum shopping is unpersuasive.  First, the
20  bankruptcy court appears to have been referring to the ultimate
21  issue of coverage, rather than the discrete issue of
22  advancement of expenses, when it suggested that it saw the
23  potential for overlapping issues between Axis' complaint and
24  the securities class action currently before Judge Lynch.
25  (Transcript 57-59, dated August 30, 2007, attached as Exhibit 5
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

27

7a5QaxiC

1   to the declaration of Greg A. Danilow.)  In any event, Axis'
2   proffered explanation does not change the fact that it could
3   have filed a motion to withdraw the reference at a much earlier
4   date and only chose to file its motion after the bankruptcy
5   court had dismissed its complaint and entered the preliminary
6   injunctions.
7            Additionally, judicial economy is not served by
8   withdrawing the reference at this point.  The bankruptcy court
9   has spent considerable time and energy to become familiar with
10  the parties' arguments with respect to the discrete issue of
11  Axis' obligation to advance costs under the policy.  Moreover,
12  the bankruptcy court has scheduled a hearing in one week to
13  consider the motions for summary judgment on the advancement
14  issue.  Even in light of the fact that the decision of the
15  bankruptcy court will be subject to de novo review on appeal,
16  it would be an inefficient use of judicial resources for the
17  Court to withdraw the reference after the bankruptcy court has
18  become familiar with the case and before it issues its ruling
19  on the dispute relating to advancement.  See, for example, In
20  re Ames Department Stores, Inc. 190 B.R. at 163-64.
21           Axis argues that the Court should withdraw the
22  reference because some of the insureds have requested a jury
23  trial.  However, the bankruptcy court has decided at this point
24  that the ultimate issue of coverage under the policy is
25  separate and distinct from the issue remaining before the
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

28

7a5QaxiC

1   bankruptcy court; namely, whether the terms of the policy
                        Page 13

2007 10 05 hrg before Koetl
2    require Axis to advance defense costs.  If the bankruptcy court
3    continues to follow its previous views, that would be an
4    additional issue to be decided on appeal.  Therefore, the fact
5    that a jury demand has been made by certain of the insureds on
6    the ultimate issue of coverage does not weigh strongly in favor
7    of withdrawal of the reference where the issue in front of the
8    bankruptcy court, as the bankruptcy court has previously said,
9    is a discrete issue of law which will be decided on
10   cross-motions for summary judgment.  Of course, all of the
11   issues involved in that Bankruptcy Court decision on the
12   motions for summary judgment will be fully reviewable de novo
13   on appeal.  Furthermore, a jury demand is only one factor in
14   the analysis, and, in any event, the possibility of a jury
15   trial at some later date does not require the court to withdraw
16   the reference in situations where judicial economy would be
17   better served by current proceedings remaining in the
18   bankruptcy court.  See, for example, In re Orion Pictures Corp.
19   4 F.3d at 1101-02; In re Ames Department Stores, Inc. 190 B.R.
20   at 162-63; In re Kenai Corp. 136 B.R. at 61.
21            Indeed, as the Court pointed out in oral argument,
22   under the statute, the Court has the authority to withdraw "in
23   whole or in part" any case or proceeding referred to the
24   bankruptcy court.  The bankruptcy court by its dismissal of
25   Axis' complaint has made it clear thus far it believes the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                                    29
     7a5QaxiC
1    underlying coverage dispute should be litigated in the district
2    court.  If any part of the coverage dispute were to remain in
3    the bankruptcy court, that may well be the subject of a motion
4    to withdraw the reference for that part of the proceeding at
5    some point in the future.
6            Therefore, Axis' motion to withdraw the reference is
7    denied without prejudice to refile after the bankruptcy court
8    has entered a judgment on the pending motions for summary
9    judgment.  So ordered.
10           Let me raise another issue with you very quickly:
11   This case is filed under M-47, and filings under miscellaneous
12   numbers in the clerk's office always produces some issues with
13   respect to filing, etc.  Are there any outstanding motions or
14   orders before me that require a decision that remain unopened
15   not correctly filed in the file?  Anything else for this court
16   to decide?  Anything open?
17           MS. GILBRIDE:  Your Honor, there's just the appeal
18   that was stayed.  I filed an appeal that we requested be
19   stayed, but other than that, there's nothing else that I'm
20   aware of.
21           THE COURT:  Because I know that there were motions to
22   consolidate the cases before me, and I just want to make sure
23   that you've gotten all of the orders that you need and they're
24   all properly filed.  From time to time there are pro hac vice
25   motions that are filed but don't get filed in the correct file
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                                    30
     7a5QaxiC
1    but nothing's open except the appeal that's been stayed.  OK.
2    Great.  Anything else?
3            MS. GILBRIDE:  We don't have anything else.  Thank
4    you, your Honor.
5            THE COURT:  Good morning all.  Good to see you all.
6            (Adjourned)
                            Page 14

2007 10 05 hrg before Koetl

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

            SOUTHERN DISTRICT REPORTERS, P.C.
                   (212) 805-0300



Page 15